THE STATE v. EVANS, Appellant.

Division Two, November 27, 1900.

1. **Indictment: USE OF "GRAND" BEFORE JURY.** Where the indictment begins by saying "the grand jurors of" and concludes with, "and so the jurors aforesaid," the omission of the word "grand" before the last use of "jurors" is not error.

2. **Evidence: SHERIFF'S TESTIMONY: EXPRESSION OF SURPRISE.** The sheriff was taking to jail a defendant who claimed as his self-defense that deceased had struck him and was beating him at the time he was shot, with a large dry elm stick, which the witness said was found near where deceased fell and died. He said to defendant, "You say he hit you with this stick?" Defendant said, "Yes, he struck me with it with both hands." The sheriff expressed surprise, and said, "I could hit you with one hand and fix you so you could not shoot me," to which defendant replied, "Well, he hit me with both hands." The defendant showed the sheriff where he claimed he was struck and the officer testified there was no bruise, knot or abrasion of the skin. *Held,* that the testimony was competent and important, *and* the exclusion of the sheriff's expression of surprise, which might properly have been excluded, would not have justified the exclusion of the evidence.

3. **"Deliberately:" DEFINITION.** Unless the jury convicts the defendant of murder in the first degree, a failure to define the word "deliberately" affords no ground for a reversal of the case, although the word was erroneously defined. The word is properly defined in State v. Fairlamb, 121 Mo. 137.

4. **Manslaughter: "HEAT OF PASSION."** An instruction on murder in the fourth degree that does not require the killing to have been done in a heat of passion, is erroneous.

5. **Uncommunicated Threats.** Uncommunicated threats by the deceased may be considered by the jury in determining who was the aggressor in the difficulty which resulted in the homicide, and whether, in connection with the conduct of deceased, they afford a reasonable cause of apprehension of danger by defendant when the difficulty began, but no further.

6. **Motive: HOW FAR EVIDENCE.** When the evidence fails to disclose a motive for the crime, this is a circumstance in favor of the innocence of the defendant which they should consider together with all the evidence in the case. And in determining whether or not there was a motive for the defendant to commit the crime charged, the jury may consider all the evidence in reference to the relations and deportment of the defendant and deceased towards each other, with all the other evidence in the case.

7. ———: **HOW SHOWN.** A witness should not be permitted to testify to mere rumors of an intimacy between the defendant and deceased's wife, even though defendant puts his moral character in evidence by declaring there has been no improper relations between them. The evidence as to his moral character should be confined to his general reputation.

Appeal from Dunklin County Court.—*Hon. J. L. Fort,* Judge.

REVERSED AND REMANDED.

*Tribble & Hall* for appellant.

(1) The indictment is fatally defective. It does not charge that defendant assaulted deceased with a pistol or with anything else. State v. Furgerson, 152 Mo. 92. It does not conclude "and so the grand jurors aforesaid," but simply says, "and so the jurors aforesaid," and for this reason is fatally defective. State v. Furgerson, 152 Mo. 92; State v. Meyers, 99 Mo. 107; State v. Stacy, 103 Mo. 11. The omission of the word "grand" before the word "jurors" is equivalent to an omission of the entire averment. State v. Furgerson, 152 Mo. 92 (98); State v. Meyers, 99 Mo. 107; State v. Stacy, 103 Mo. 11; State v. Pemberton, 30 Mo. 376. (2) It was error for the court to permit the witness Henry Lane to testify as to the rumors that he had heard regarding the supposed immoral relation between defendant and the wife of

deceased.  He had offered proof of his character as a peaceable, quiet, moral citizen, and it was not competent to disprove his character by proof of a single specific act of immorality. This would be true even if the inquiries as to his, defendant's, character should extend to his moral character only.  Character can not be impeached by proof of particular or single specific acts.  It must be general.  State v. Welsor, 117 Mo. 570; State v. Bulla, 89 Mo. 595; Patrick v. Steamer, 19 Mo. 73; State v. Reed, 85 Mo. 194; State v. Reavis, 71 Mo. 420; State v. Tabor, 95 Mo. 590; State v. Goetz, 34 Mo. 85.    (3) The officer who arrested the defendant was permitted to detail what he said to the defendant while he yet had him in custody; and to state what he, Morgan, said to the defendant regarding his, Morgan's, opinion as to whether or not the defendant had been hit with the club.    It was merely his impression and should have been excluded. The club was in evidence before the jury and they should have been permitted to draw their own conclusions.    State v. Miller, 44 Mo. App. 159; State v. Gates, 103 Mo. 357; Muff v. Railroad, 22 Mo. App. 584; Madden v. Railroad, 50 Mo. App. 666; Railroad v. Stock Yards Co., 120 Mo. 541.

*Edward C. Crow,* Attorney-General, for respondent.

GANTT, P. J.—The defendant was indicted in the circuit court of Dunklin county in the year 1892 for the murder of Alexander St. Aubin.    On his application a change of venue was awarded to Butler county and the cause was dismissed in 1894.    At the August term, 1895, he was again indicted in the circuit court of Dunklin county.  He was duly arraigned and was finally tried on the 19th day of October, 1899, and convicted of murder in the second degree and sentenced to imprisonment in the penitentiary for ten years.

The indictment is as follows:

"The grand jurors of the State of Missouri, summoned from the body of Dunklin county, Missouri, now here in court, duly impaneled, sworn and charged to inquire and true presentments make, upon their oaths present and charge that James Evans, on the 13th day of August, A. D. 1892, at the said county of Dunklin in the State of Missouri, did then and there in and upon the body of one Alexander St. Aubin, then and there being feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought, make an assault, and that the said James Evans, a certain pistol, then and there charged with gunpowder and a leaden bullet, which said pistol, he the said James Evans, in his right hand then and there had and held, then and there feloniously, willfully, deliberately, premeditatedly and of his malice aforethought, did discharge and shoot off, to, against, and upon the said Alexander St. Aubin, and that the said James Evans with the leaden bullet aforesaid, out of the pistol aforesaid, then and there by force of the gunpowder aforesaid, by the said James Evans discharged and shot off as aforesaid, then and there feloniously, willfully, deliberately, premeditatedly, and of his malice aforethought, did strike, penetrate, and wound him the said Alexander St. Aubin in and upon the left side of the body of him the said Alexander St. Aubin, giving to him, the said Alexander St. Aubin, then and there, with the leaden bullet aforesaid, so as aforesaid discharged and shot out of the pistol aforesaid, by the said James Evans in and upon the left side of the body of him the said Alexander St. Aubin, one mortal wound of the depth of five inches and of the width of half an inch, of which said mortal wound he the said Alexander St. Aubin then and there instantly died. And so the jurors aforesaid, upon their oath aforesaid, do say that the said James Evans him, the said Alexander St.

Aubin, in the manner and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly and of his malice aforethought did kill and murder. Against the peace and dignity of the State."

The evidence tended to establish the following facts.

Prior to the 13th day of August, 1892, the defendant and deceased lived in the same neighborhood. Deceased was a married man and defendant single. Bad blood had been engendered between them, growing out of some alleged familiarity of defendant with the wife of deceased. On the 4th of July, 1892, a little over a month before the homicide, the defendant had a conversation with William Sparks. It seems that there were two picnics in the neighborhood of Kennett, the county seat, one at the Fair Grounds and the other at Wright's Grove. Sparks and defendant were at the Fair Grounds. About four o'clock in the afternoon defendant came to Sparks and inquired if he had seen Alexander St. Aubin and Teroy. Sparks answered that he had seen Teroy, but St. Aubin had been there, but had left. Thereupon defendant said to Sparks, "Let's go up to the Wright Grove." Sparks assented and they came up into the town of Kennett and stopped in front of Rigg's hardware store. Defendant said, "Wait a minute, I want to go in here," and went into the store and Sparks followed him. Defendant bought some cartridges and came out. They walked on, defendant holding the cartridges in his hand until he reached a livery stable, when he said to Sparks, "Them fools may be up there; if I get into it I am going to make it hot for them."

In the course of his conversation with Sparks defendant said he and St. Aubin were at outs; that he had kissed St. Aubin's wife, and he would kiss her again. "It seemed like that was the cause of the trouble between them."

Vol. 158 mo—38

On August 13, 1892, St. Aubin and his wife went to church at night at a church on what is known locally as Johnson's island. Defendant also went. After the meeting defendant and John King left the church together, and walked down the public road in the direction of defendant's home. When they reached a spot near the residence of Mr. Brower, King and defendant sat down on a log. King stated he was sick. While thus seated the deceased, St. Aubin, and his wife came along, each riding horseback. King, who had hired himself to St. Aubin as a laborer, spoke to St. Aubin as he came to them, and inquired if his horse would "tote double;" that he was sick and wanted to ride home with him. King was not sworn as a witness.

Henry Lane testified in behalf of the State that he was riding home from church that night and had stopped at the forks of the road; that St. Aubin and his wife passed the forks and stopped for some cause. Witness saw St. Aubin get off his horse and heard him talking to some one but could not distinguish the words.

He then heard a lick strike like somebody was striking another. About that time defendant and St. Aubin started to run afoot down the road in the direction of witness, and as they got in front of witness defendant shot St. Aubin. Defendant was in front, and St. Aubin following about three or four feet behind. Defendant fired two shots at St. Aubin. When he fired the first shot St. Aubin said, "Jim, you have killed me," and defendant answered, "If I hain't I can do it," and fired another shot. The first shot struck deceased and penetrated his heart. He groaned once or twice and died. This witness says St. Aubin had nothing in his hands at the time he was shot. He could see both parties distinctly. A dried elm stick was lying about two or three feet from where deceased fell. The stick was about two feet long.

Upon cross-examination the witness said he heard defendant say when he heard the first lick, "Don't Alex," or something to that effect. When defendant fired he was about half turned around. St. Aubin was twenty-five or thirty pounds heavier than defendant.

Dr. Rosenthal, the coroner, testified he made a post mortem examination of deceased and found he was shot through the heart. The wound was mortal.

After the shooting defendant said his head was hurt, and asked Brower, one of the witnesses, to feel his head. Witness rubbed his hand over his head, but discovered no knot on his head and no blood. The sheriff Morgan who arrested defendant at the inquest the day after the homicide, testified he had the stick referred to by the witness and was taking it to town with the prisoner, and he remarked to defendant, "He hit you with this stick?" Defendant said, "Yes, he did, with both hands," and the sheriff asked, "Where did he hit you?" Defendant showed him on the side of the head. The sheriff testified he looked· but couldn't see any sign of a skinned place or bruise, and no bump. The sheriff then said, "He certainly didn't hit you with both hands with that club. I could hit you with one hand with that, and fix you so you couldn't shoot me." Defendant answered, "Well, he hit me with it with both hands." The defendant offered evidence tending to prove uncommunicated threats by deceased against defendant.

William Clark testified that the deceased was at Sexton's saloon on the afternoon before he was killed that night, and was talking to witness about the case and asked his advice. Clark says he said to deceased, "I understand you boys had fixed your fuss up, dropped it." He says, "Yes, we did but I am going to have revenge out of Jim." Clark said, "If I were you, Alex, if I had anything against Jim, says I, you are

a large man, I would just paddle him. I wouldn't monkey with him." Deceased said, "No, I won't do it. I won't dirty my hands with him. I will take a club to him," and "beat hell out of him."

Witness did not communicate this evidence to defendant. This witness on cross-examination testified he knew nothing about the origin of the trouble between defendant and deceased.

Joseph Davis, another witness for defendant, testified that on the afternoon before the killing on Saturday night, deceased told him if he would see Jim Evans (the defendant) and have Jim raise a row with him (deceased) he would give him a five dollar hat. Deceased didn't tell him why he wanted him to raise the disturbance. Witness did not communicate this conversation to defendant. The widow of the deceased subsequently married T. F. Pearson. Her deposition was taken by defendant and was as follows:

"My age is 24 years, and my residence, Success, Clay county, Arkansas.

"Q. Are you acquainted with the defendant, James A. Evans? A. Yes, sir.

"Q. Were you acquainted with Alexander St. Aubin in his lifetime? A. Yes, sir.

"Q. State whether he is now living or dead? A. He is dead.

"Q. When did he die? A. He died the 13th day of August, 1892.

"Q. State how he came to his death, if you know? A. He was shot and killed by James Evans.

"Q. What relation were you to the deceased Alexander St. Aubin? A. I was his wife.

"Q. You have since married Mr. T. F. Pearson? A. Yes, sir.

"Q.   State the circumstances of the killing, if you were present and saw him killed?   A.   My husband and I had been to church about a quarter of a mile from where he was shot.   We were going home after church, between ten and eleven o'clock at night.   My husband had told me he expected to have a fuss and tried to get me to go home with my sister, Jennie Kimbow.   He told me he expected Evans to kill him as he had nothing but a stick to defend himself with.   We were riding towards home in the lane near Mr. Brower's house, and John King stopped us and asked my husband if his horse would tote double, and my husband says yes.   My husband asked him who that was sitting on the log with him. John said Jim, and my husband said, "Jim who?" and he said, "Jim Evans."   My husband got off his horse and said: "Jim, this is about as good a time as we will have to settle our fuss."   Up to this time Jim had not spoken to my husband that night.   Jim Evans said nothing then.   My husband struck him twice with a stick, and Evans then run off apiece down the road towards the church house, and Alex ran after him.   Jim says, "O! O! don't Alex."   These are the first words I heard Evans say.   My husband was running towards Evans and Evans pulled his pistol and shot him.   He shot twice; after Evans shot the first time Alex said:   "You have killed me."   Evans said:   "If I ain't, I will."   When I heard the first shot I got off my horse and ran to my husband; before I got to him the second shot was fired.   He breathed three times after I got to him.

"Q.   When you speak of your husband and of Alex, whom do you refer to?   A.   I refer to my husband, Alexander St. Aubin.

"Q.   Where you use the word Jim in your testimony whom do you refer to then?   A.   Jim Evans.

"Q.   Who else besides yourself were present when the

shots were fired? A. James Chambers, Henry Lane and John King, were present.

"Q. Was there at any time any improper conduct between yourself and Jim Evans the defendant? A. No, sir.

"Q. In what county and State was your husband killed? A. In Dunklin county and State of Missouri on what is known as Johnson's island on the night of the 13th of August, 1892.

"Q. Up to that time you were living with your then husband, Alexander St. Aubin, in Dunklin county, Missouri? A. Yes, sir."

Sol Evans, an uncle of defendant, testified he was in Kennett on the day of the homicide. He did not see deceased, but he says he went home that evening and found defendant at his house, just starting to church. Defendant said he was going to church. Witness said to him, "Come in here." He then said to defendant, "I was warned of big threats to-day, and you better look out and keep your pistol pretty close to you, or keep pretty close to your pistol." Defendant went back into the house, got his pistol and put it in his pocket. He then started to the church some three or four miles distant. This witness testified that a week after the homicide, defendant came to his house, and witness cut his hair for him, and he noticed that his head was swollen a right smart and the hair was matted.

Dr. Cawthorn testified that several days after the killing of deceased he was called upon by defendant to dress a wound in his head. He found a wound about three-fourths of an inch, considerably bruised and the skin broken; the wound was perpendicular, not lateral. He testified further that in treating such a wound he usually clipped all the hair off and supposed he did in this instance. Took a stitch and put on a healing plaster.

William Evans, a brother of defendant, testified he went to church with defendant that night.   After the meeting was over he started home on the same road the defendant and St. Aubin did.   He was about thirty yards distant when the shooting occurred.   Two shots were fired.   He came up after St. Aubin was killed and put his hand on defendant and told him to go home.   After defendant started he found blood on his hand and he followed and asked if he was hurt and defendant said St. Aubin had hit him over the head and nearly killed him.   He was bleeding.

Defendant testified in his own behalf: "As I was coming back from church there was Bill Evans and his wife and me and a younger brother, I believe.   John King and I happened to get in front, I suppose we got fifty or sixty yards in front and we come to this place where this cross lane went up and the crowd split and some went out that way—very often when the crowd comes there they stand and talk.   I says to John. 'Lets wait here till our crowd comes and not go on by ourselves.'   We sat down and hadn't been there over two minutes and a half at the outside till this man Aubin and his wife—"

"Q.   St. Aubin?"

"A.   Yes, sir; Alexander St. Aubin and his wife come riding up and John spoke to him; he says, 'Hellow, Alex, will your horse tote twice'—that is the way John said the words. Alex says, 'Yes.'   John says, 'I want to ride behind you, Alex, for I am sick.'   Alex says, 'All right.   Who is that with you?'   He just twisted around in his saddle.   John says, 'It is Jim.'   He carried his foot over the horse's back, started down to the ground, and says 'Jim who?'   John says, 'Jim Evans.'   He turned around to me, and says, 'Jim, we had better settle our trouble.'   That is as near his words as I can remember now.   I had never spoke yet, and he struck me with a club.   When he struck me he knocked me over on

the side of the log, and that saved me from falling, the log.   I jumped to my feet and in jumping to my feet it threw me close to Mr. Aubin as he struck me the second lick.  He struck me on top of the head, and it had very little effect; he knocked me blind the first lick.   I run down to where this cross lane come in—it is about fifteen steps—I have stepped it two or three times and thought I would remember the amount of steps, but I don't exactly—it is somewhere about that amount of steps—may be twelve—may be eighteen, in that neighborhood.   I glanced my eyes back, seen he was right on me with his club drawn—as quick as I could jerk my pistol out of my pocket I shot him.

"Q.   Were you standing still when you shot him or still running?   A.   I was still running.

"Q.   State whether you turned around and fired?   A. I shoved the pistol back under my arm that way and shot at the man.

"Q.   State why you shot him—whether you thought you were in danger of your life?   A.   Yes, sir; I thought that was the only show, for me to kill the man.

"Q.   He was gaining on you?   A.   Yes.   He was at least within four feet, from the best I could see.   It might have been five feet of me when I shot him.

"Q.   Now, then, you say it was in the night time?   A. Yes, sir.

"Q.   What time of the night was it?   A.   It must have been about ten o'clock.   Just after services had broke—an ordinary country meeting.

"Q.   State whether or not the lick he gave you with that club injured you any or not?   A.   It skinned some little place on the side of my head.

"Q.   State where and to what extent?   A.   Well, up there—I can show the scar, if it is necessary, to the jury.

"Q.   There is no objection to it—

"Witness submits to an examination of his head by the jury, indicating to them where the scar is located upon the right side of the head. Witness: It was a small cut. It seemed to bleed free.

"Q. State if there was any covering over your head which protected you or kept the blow from necessarily hurting you worse? A. I had on my hat, and the hat was too large for me, and I had folded some paper up and stuck under the sweatband.

"Q. State where that struck? A. It struck right square on the sweatband—it looked like the print of a knot cut the band through. It showed plain the next day. I showed the dent on the band of the hat to two or three others. It seems to me I showed it to Bill Evans.

"Q. Have you got the hat now? A. No, sir; I wore it out and throwed it away a good while ago.

"Q. You state that at the time you shot, you shot in order to protect your own life, you believed he would kill you if you didn't kill him? A. That is what I shot for.

"Q. How far did you run after you fired the last shot until you stopped? A. I can't tell exactly. I don't know as I could tell at all how far I did go after I shot before I stopped and turned back and walked back toward where the man lay. I might have been ten or fifteen feet on still down the road before I stopped.

"Q. Now, you show on the right side of your head where you were struck? A. Yes, sir.

"Q. State how he struck? A. He struck with both hands, I saw the first lick plainly—he struck just that way, with both hands the first lick. Of course I couldn't see when he struck the other one because I was knocked blind.

"Q. Had you said one word to him that night? A. No, sir.

"Q.   Up to the time he struck?   A.   No, sir; not since that evening before, I reckon three or four o'clock, or two or three, somewhere along there, it was in the afternoon, I met him in the road and spoke to him, 'Howdy Alex,' and he says 'Howdy Jim,' and passed on.

"Q.   That night you hadn't spoken a word?   A.   No, sir.

"Q.   Had you made any motion or gesture?   A.   No, sir; I was sitting with my hands on my legs as I am sitting here.

"Q.   There were some statements made yesterday regarding rumors of improper relations between you and the wife of Alex. St. Aubin; just state to the jury whether there ever were at any time any improper relations between you and her?   A.   If there ever was I don't know anything about it.   I was at a play party one night and she happened to be there.   We played where there was kissing in it and I don't recollect, it seems to me I kissed her at the party.   I know I kissed Bill Evans' wife.

"Q.   It was a part of the play?   A.   Yes, sir.   The others did the same as I did.   If that is improper relations I had improper relations with her.

"Q.   Is that what you referred to when you were talking to Mr. Sparks in the conversation he detailed   A.   Yes, sir; that is the only time I ever kissed the woman or ever thought of such.

"Q.   Were you ever with her alone at any time?   A.   No, sir; I never was.

"Q.   Never made any indecent proposal to her of any kind?   A.   No, sir; I never did."

Other facts and the instructions will be noted in the course of the opinion.

I.   The indictment is challenged on two grounds.   It is

State v. Evans.

insisted that the omission to use the word "with" in charging the assault, and the failure to use the word "grand" before "jurors" in the conclusion clause of the indictment, was error. Counsel relies upon State v. Furgerson, 152 Mo. 92; State v. Meyers, 99 Mo. 107; State v. Stacy, 103 Mo. 11, and other cases in this court.

The learned counsel has clearly misapprehended the decisions in those cases. Neither of those cases held that the omission of the word "grand" before the word "jurors" was error. The indictment was held defective in the Meyers case, because it did not conclude with a charge by the *grand jurors upon their oath,* that the defendant in manner and form aforesaid did kill and murder, but concluded as follows, "And, so said Charles Meyers and John Bogard, in manner and form aforesaid," etc. There was no charge by the grand jurors at all in the conclusion and none that their charge was "upon their oath." It was held that this averment in the conclusion was essential to an indictment at common law and has always been deemed necessary in this State. [State v. Pemberton, 30 Mo. 376; State v. Meyers, 99 Mo. 107; State v. Ferguson, 152 Mo. 92; State v. Sanders, 158 Mo. 610.]

But in State v. Pemberton and State v. Meyers no objection whatever was made to the failure to repeat the word "grand" before "jurors," where the conclusion was *"and so the jurors aforesaid* upon their oath aforesaid do say," etc.

On the contrary this was the exact form approved in Heydon's Case, 4 Coke 41b, and by Chitty in the third volume of his Criminal Law, marginal page 751, where the last named author translates the law Latin in Heydon's case as follows: "And so the jurors aforesaid upon their oath aforesaid do say," etc. [State v. Rector, 126 Mo. 328.]

The learned counsel also misapprehends the Furgerson and Rector cases, *supra,* as to the failure to use the preposition "with."

In those cases without said word there was no averment with what the homicidal act was done, but a reference to the indictment in this case will demonstrate that there was no such omission. On the contrary, the charge is clear and explicit, that the defendant, "a certain pistol then and there charged with gunpowder and a leaden bullet, which said pistol, he the said James Evans in his right hand then and there had and held, then and there feloniously, willfully deliberately and premeditatedly and of his malice aforethought did discharge and shoot off, to, against and upon the said Alexander St. Aubin and that the said James Evans *with* the leaden bullet aforesaid out of the pistol aforesaid, then and there by force of the gunpowder aforesaid, by the said James Evans discharged and shot off as aforesaid then and there feloniously, willfully, deliberately, premeditatedly and of his malice aforethought did strike, penetrate and wound him, the said Alexander St. Aubin." No more specific charge of how and by what means the homicidal act was committed is to be found in the precedents of criminal pleading. It follows the objections to the indictment are without merit.

II. The defendant's counsel in his opening statement, said to the jury that deceased had struck and assaulted defendant before defendant shot him. This we think from the evidence was controverted by the State. Both the sheriff Morgan and witness Brower testified to feeling the head of defendant after the homicide and that there was no knot or blood on his head. Whereas defendant and his brother and uncle and Dr. Cawthorn testified to such a wound and blood. The issue was sharp.

Defendant assigns as error the sheriff's statement of the way in which he came to examine defendant's head next day. He was taking defendant to jail, and had the dried elm stick which the witness said was found in the road near where de-

ceased fell and died. He said to defendant: "You say he (meaning deceased) hit you with this stick? Defendant said, "Yes, he struck me with it with both hands." The sheriff expressed surprise, and said, "I could hit you with one hand and fix you so you could not shoot me," to which defendant replied, "Well, he hit me with both hands." He showed the sheriff where he claimed he was struck and that officer testified there was no bruise, knot or abrasion of the skin. The testimony was competent and important. The mere expression of surprise of the sheriff might have been eliminated, but that would not have justified the exclusion of the evidence that the defendant claimed he was struck by a blow with a stick and the further fact that this blow left no evidence of its infliction.

III. An exception was saved to the third instruction given in behalf of the State in which the court defined the word "deliberately" as meaning "in a cool state of the blood, that is, not in a heat of passion caused by some just provocation to passion." As the jury did not convict defendant of murder in the first degree, this error in defining this word affords no ground for reversal of the judgment. [State v. Eaton, 75 Mo. 591; State v. Alfrey, 124 Mo. 393.]

The trial court, however, erred in its definition, and should avoid it hereafter. This word is properly defined in State v. Fairlamb by this court. [State v. Fairlamb, 121 Mo. 137; State v. Ellis, 74 Mo. 220; State v. Donnelly, 130 Mo. 647.]

IV. The defendant complains of the fourth instruction for the State defining manslaughter in the fourth degree.

That instruction is as follows: "The court instructs the jury that if they find and believe from the evidence that at the county of Dunklin and State of Missouri on the 13th day of August, 1892, deceased, Alex. St. Aubin, assaulted defend-

ant James Evans and struck him with a stick, that said Evans retreated and that said St. Aubin pursued said defendant and that said blow and pursuit was made and begun by said St. Aubin, and that said defendant thereupon shot and killed said St. Aubin with a bullet fired from a pistol held by the said defendant then and there, and that such blow and pursuit were a just provocation therefor, then you will find the defendant guilty of manslaughter in the fourth degree, unless you believe and find from the evidence that said homicide was justifiable on the ground of self-defense, as laid down in these instructions."

If the jury believed the evidence of defendant and his witnesses to the effect that deceased without any cause assaulted and struck defendant with a stick and defendant in a heat of passion aroused by such provocation shot and killed deceased, without malice and premeditation and not in the necessary defense of his person, he was guilty of manslaughter and no greater offense.

Whether the deceased did so assault him was a question of fact for the jury, but the instruction was erroneous.

Manslaughter in the fourth degree as applicable to the facts of this case was defined in State v. Numfried, 76 Mo. loc. cit. 407, except that by an oversight the words "from the evidence" was omitted after the words "if the jury find and believe." It will be observed that the learned circuit court did not require the killing to have been in a heat of passion as required by our statute, section 1834, Revised Statutes 1899, As the jury might have found the defendant guilty of manslaughter in the fourth degree had a proper instruction been given, we are forced to hold the instruction given was reversible error.    [State v. Chas. Ellis, 74 Mo. 215; State v. Dieckmann, 75 Mo. 570.

V.    The fifth instruction defining the law of self-defense

State v. Evans.

was exceedingly favorable to defendant, and the exception thereto is not well founded.

VI. The 7th and 9th instructions have often been approved by this court and were entirely proper under the facts developed in this case.

VII. The 10th instruction is severely criticised by counsel for defendant.

That instruction is in these words: "The court instructs the jury that you should consider all threats, which you may believe from the evidence were made by the deceased against the defendant, and give them such weight in determining the nature of the transaction giving rise to the charge for which the defendant is now on trial, as you deem proper; mere threats, however, will not justify on the ground of self-defense the shooting alleged in the indictment, nor will threats alone warrant the party against whom they were made in killing the party who made them."

We think the view of the court is unhappily expressed. The threats, if any, by deceased, were not communicated to defendant, but as it was very doubtful who was the aggressor when the homicide occurred, it was proper enough to advise the jury that they might consider these uncommunicated threats, if any there were, in determining who was the aggressor that night, and in characterizing the conduct of deceased toward defendant, and in reaching a conclusion as to the reasonableness or unreasonableness of defendant's conduct. The court properly told the jury that mere threats by deceased without any effort to carry them out would be no defense to defendant, but if the jury found deceased had made threats against defendant and before the encounter and was the aggressor in the difficulty in which he was shot, they might reasonably find that he intended to execute them.

The evidence of Sol Evans can not be treated as a com-

munication of any threats by deceased. This witness did not see deceased and the court should have excluded his unsupported hearsay upon proper objection. The only effect the threats of deceased could have in this case would be to enable the jury to determine who was the aggressor, and whether in connection with the conduct of deceased they afford a reasonable cause of apprehension of danger by defendant, when the difficulty began. The defendant being ignorant of them could not and did not act upon them. The court can readily modify the instruction to meet these views.

VIII. The fourteenth instruction is also challenged by defendant. It is as follows:

"In considering of your verdict you will regard the testimony relating to improper relations between the defendant and the wife of the deceased St. Aubin only in so far as the same may be considered by you in passing upon the defendant's moral character and in so far as the same may be considered by you in showing a motive to commit the crime charged against the defendant. If you find the defendant had a motive to take the life of deceased then that fact may be considered by you in passing upon the defendant's guilt or innocence. On the other hand if you find upon a careful examination of all the evidence in the case that the evidence fails to show any motive on the part of the defendant to commit the crime charged against him, then this is a circumstance which the jury ought to consider in connection with all the evidence in the case in making up their verdict. And in order to ascertain a motive, or the absence of a motive, the jury will take into consideration all the evidence in reference to their associations, relations, and deportment toward each other, together with all the other evidence in the case."

This instruction must be considered in connection with the evidence in regard to the alleged statements made by de-

fendant to the witness Sparks to the effect that he had kissed the wife of deceased and would do so again, and whether this conduct had brought about the bad blood between deceased and defendant.

If the jury believed defendant had taken these liberties with the wife of deceased, it tended to show the existence of a motive for the killing, and the jury might consider the fact. We think the evidence of Sparks was admissible, but we think error was committed in permitting the witness Lane to testify to mere rumors of such an intimacy between the defendant and the wife of deceased, even though defendant did put his character for morality in evidence.    The cross-examination as to his moral character should have been confined to his general reputation in that respect, and not the mere rumors of individual delinquencies with defendant's wife.

The court having erred in permitting the witness to answer that he had heard rumors in regard to defendant and wife of deceased, the instruction as to the effect of those rumors and the relations of defendant and Mrs. St. Aubin as bearing on his moral character was erroneous.    Many facts are admitted in evidence to prove the allegations of an indictment which it is not proper to single out and make the basis of a separate instruction.

Where it is doubtful as to the motive of a crime, the court may properly instruct the jury that if they find the defendant guilty as charged in the indictment, it is their duty to so find in their verdict whether the motive for the crime be apparent or not, but when the evidence fails to disclose a motive for the crime, this is a circumstance in favor of the innocence of the defendant which they should consider together with all the evidence in the case.    In determining whether there was or was not a motive for the defendant to commit the crime charged against him in the indictment, they

Vol. 158 mo—39

should be instructed that they may consider all the evidence in reference to the relations and deportment of the defendant and deceased toward each other with all the other evidence in the case.

No error was committed in refusing to direct a verdict for defendant and instructing on murder in the second degree. As to remarks of counsel we do not think they exceeded the bounds of legitimate inference and discussion. For the errors noted the judgment is reversed and the cause remanded for a new trial. We can not forbear condemning the unprecedented delay which has occurred in the prosecution of this case. This homicide occurred in 1892. Under any proper exercise of diligence it should have ended seven years ago. Such delays must continue to be a reproach to the administration of justice. We do not know where the fault lies, but we trust we may not again have occasion to comment upon such inexcusable delay.

The judgment is reversed and the cause remanded. *Sherwood* and *Burgess, JJ.,* concur.