STATE of Missouri, Respondent,

v.

James Rufus PAYNE, Appellant.

No. 48115.

Supreme Court of Missouri,

Division No. 1.

Feb. 13, 1961.

Bruce Nangle, St. Louis, for appellant.

John M. Dalton, Atty. Gen., Richard R. Nacy, Jr., Sp. Asst. Atty. Gen., for respondent.

HYDE, Judge.

Defendant was convicted of manslaughter (Sec. 559.070) having also been charged under the Habitual Criminal Act. (Sec. 556.280; statutory references are to RSMo, 1959 revision, and V.A.M.S.) After a jury verdict of guilty, the court, having found previous convictions, sentenced defendant to imprisonment for ten years. Defendant has appealed but has filed no brief so we consider the assignments properly made in his motion for new trial.

Defendant raises the question of the sufficiency of the evidence to make a case (assignments 18 and 20) so we will state the facts shown by the State. (Defendant did not testify and offered only a statement made by him after his arrest, identified by the Assistant Circuit Attorney.) " 'In determining the sufficiency of the evidence to sustain a conviction, we consider as true the evidence favorable to the State and the favorable inferences reasonably to be drawn therefrom; and evidence to the contrary is rejected.' State v. Thomas, Mo. Sup., 309 S.W.2d 607, 609, and cases cited."

Defendant lived in the front apartment of a building in St. Louis with his grandmother, who was in Michigan in June 1959, his cousin, Collie Jean Stallworth, the deceased, and James Draper, who was living with Collie Jean although not married to her. Collie Jean had a baby about eight months old born before she began living with Draper. About 4:00 A.M. on Sunday, June 7, 1959, Ezell Campbell, who lived in the rear apartment in the same building, came there with Mance Herman and heard a woman screaming in the front apartment. (Campbell said she screamed: "God have mercy. Somebody please help me.") They went to the front door and after they knocked several times defendant came to the door in an undershirt and shorts. Campbell asked defendant about the screaming and whether anyone was hurt. Defendant said he was asleep and didn't hear anybody scream. Herman jerked the door out of defendant's hand and went in. There was no light in the apartment but, from light shining in the bedroom from outside, he could see a woman on the floor with her head under the bed with her clothes "from her waist up around her neck" with nothing on the lower part of her body. Herman offered to pick her up off the floor but defendant was angry and told him to leave her alone. Herman and Campbell left and soon heard a woman's screams again coming from the same place but did not go back.

James Draper had been put in jail on Friday, June 5th, for fighting with Collie Jean. Campbell and his son Bobby bailed him out Sunday morning about 9:30. They first went to defendant's apartment, about 8:00 A.M., to see if Draper was still in jail. Defendant came to the door when they knocked and told them Draper was in jail but said there was no need to get him out because he would have to appear in court Monday morning anyway and that Collie Jean was not going to show up to prosecute. At the police station they were told to come back at 9:00 A.M. so they went back and saw defendant again. Defendant brought out a bottle of vodka and they sat on the front porch drinking until 9:00 A.M. They saw two spots of blood on the vodka bottle. When Draper was released, he came with Bobby Campbell to the apartment to get his clothes. He found them on the couch in the living room and asked defendant what they were doing there. Defendant said they were out for him. Draper then went into the bedroom to look for more of his clothes and saw the mattress from the double bed over the single bed. When Draper started toward it, defendant said he had all of his clothes off that bed. Draper asked defendant where Collie Jean was and he said she had gone to work. While Draper was there, her employer telephoned to ask where she was and defendant answered it. Later in the day, defendant went to Bobby's apartment and left Collie Jean's baby there with Bobby's wife and sister. He did not return for the baby that night, and it remained with them through the next day. Defendant told them Collie Jean was at work.

About 4:00 P.M., Monday, June 8, Draper went back to the apartment building, and the Campbells told him defendant had left Collie Jean's baby with them. To get some milk for the baby, Draper broke into defendant's apartment, and then smelled a peculiar odor. He walked to the bedroom and noticed flies swarming over the single bed. He began looking for the cause of this, then discovered Collie Jean's body on the single bed under the double bed mattress and some clothing. He went back to the Campbells, and they called the police.

The police homicide squad delivered Collie Jean's body to the Homer Phillips Hospital. There, Dr. Golden pronounced the body dead on arrival, and noted an odor of decomposition and observed swelling accompanying the decomposition in the face and head. The autopsy report of Dr. B. T. Williams, admitted in evidence, showed the body to be "rather markedly decomposed," with extensive skin slipping, intracaviarity gas formation and the bulging of eyes and tongue which accompany decomposition. Three head lacerations were shown. One was 2¼ inches in length, and another 1¼ inches in length, both parallel cuts located to the right of mid-line, running diagonally toward the rear and to the center of Collie Jean's head. The third laceration was of stellate shape with skin edges turned inward to form a triangle. Each side of the triangle measured 1½ inches. There was a skull fracture to the rear of this and underlying it. The autopsy report stated the cause of death was "traumatic skull fracture with epidural hemorrhage."

There was an axe in the apartment, belonging to defendant's grandmother, which was kept in the bedroom standing against the wall. There was blood on both sides of the blade but it could not be typed because it had decomposed. However, it was determined that the blood on the axe, on defendant's undershirt, and on Collie Jean's brassiere was human blood of the same group designation.

Defendant's confession, offered by both the State and the defendant, was to the effect that Collie Jean cursed him because he wouldn't call the police when she and Draper were fighting the night before; that she finally came at him with a butcher knife; that he got the knife away from her and pushed her with the palm of his hand so that she fell by the double bed; that she got up, came at him again and got her arms around his neck; that he then hit her and

she fell backward between the single bed and the chest of drawers; and that he then saw blood coming from her head, heard her "blowing heavy and hard" so he "picked her up and put her in the bed." His claim was that when she fell her head struck the blade of the axe, standing against the wall. Defendant said he started to telephone someone two or three times but did not but went back to bed and went to sleep. He was awakened by Campbell knocking on the front door. Defendant had consumed whiskey, vodka and beer that night, coming back after midnight; he said Collie Jean let him in, drank some of the beer he brought and then went to bed, before she got up and began cursing him.

Obviously these facts were sufficient to make a case on the State's claim that defendant caused Collie Jean's death by striking her with the axe and for the jury to find him guilty of manslaughter. Certainly the jury could reasonably find that defendant's claim that she fell against the axe was refuted by the nature of the wounds, two lacerations parallel to each other and the stellate shaped wound in another place causing a depressed skull fracture, which would require severe force. The medical testimony was "the wounds are all in the posterior portion of the skull, so her back would have had to have been to that person," if she had been struck by a person swinging the axe. Defendant made no explanation of the screams heard by Campbell and Herman before and after they went to the apartment. Furthermore, defendant's guilt is indicated by his concealment of the body, his efforts to keep it from being discovered, his statements (admittedly known to be untrue) that Collie Jean was at work, and his efforts to keep the Campbells from getting Draper released, so he would not come back to the apartment. Therefore, we hold the court properly submitted the case to the jury. This ruling also disposes of assignment 16 alleging error in giving Instruction 1 claiming "there was no testimony or evidence offered setting forth the cause of decedent's

death or at what time the decedent died." We hold the facts shown by the evidence hereinabove stated were sufficient to support the required findings.

Assignment 8 alleges error in admitting the record of the autopsy and assignment 19 alleges error in admitting the testimony of Dr. Thomas based on that report. The doctor who made the autopsy was not present at the trial and the record was produced by the chief clerk, Miss Quinn, for the coroner's office. Objection and ruling were as follows:

"Mr. Nangle: I want to make an objection on the grounds that I don't believe this record to be qualified to show that it was kept in the ordinary course of business, or that the person that testified to this record was qualified to testify as to the procedure that was followed in the preparation of this record to allow her to say that this was kept in the ordinary course of business as understood by the Business Records Act. She testified on cross-examination that she didn't have control over or knowledge of the tape used in dictating by the doctor who performed the autopsy; has no knowledge of where that tape was; how long it had been written; who it was that transcribed from that tape to the form that Mr. Draper wishes to introduce.

"The Court: The Court believes that it may be inferred that the dictation took place as of the time of the examination of the body at the Morgue and as by the testimony of the witness. The Court may further infer that the tape upon which the doctor's findings were dictated was subsequently and within a short time transcribed. The Court may further infer from the testimony of this witness, that these procedures were the procedures followed normally in the usual course of business of the Coroner's Office of the City of St. Louis. The objection will be over-

ruled and the exhibit admitted in evidence."

Sec. 490.680 provides: "A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

■ Miss Quinn testified she had custody of the coroner's records, of which this was one; and said the pathologist making an autopsy dictates his findings on a dictaphone tape at the time and a stenographer then types it into a report on a regular form which is the coroner's official form. The record offered was on this form and it is certainly not essential that the dictaphone tape be kept after it has been transcribed. We think there was a sufficient showing under our decision in Rossomanno v. Laclede Cab Co., Mo.Sup., 328 S.W.2d 677, 681, (see also State v. Winn, Mo.Sup., 324 S.W.2d 637, 642, and cases cited) and hold that the court properly admitted the autopsy record. Therefore, it was also proper to permit Dr. Thomas to testify concerning its contents and meaning. Furthermore, we note that the objections made during his testimony at the trial were not included in the ground stated in the motion for new trial and concerned entirely different matters. See State v. Hernandez, Mo.Sup., 325 S.W.2d 494, 496.

■■ In assignments 5, 6, 7 and 21, defendant alleges error in permitting rebuttal evidence. One objection is that the name of rebuttal witness Mrs. Annebelle Horton was not endorsed on the indictment. "We have held that the statutes requiring the names of witnesses to be indorsed on an indictment or information do not refer to witnesses called in rebuttal." State v. Jennings, 326 Mo. 1085, 34 S.W.2d 50, 53,

and cases cited. Furthermore, Supreme Court Rule 24.17, V.A.M.R., permits use of other witnesses and we have said that a mere objection without a proper showing of prejudice and need for additional time has been considered insufficient (State v. Malone, Mo.Sup., 301 S.W.2d 750, 756). Here instead of objecting defendant asked for an offer of proof which was denied. Defendant then objected on the ground that Mrs. Horton had been present in court during the entire trial but it is not stated in the motion that witnesses were excluded or that the witness violated any rule therefor. Mrs. Horton's testimony was that defendant had gone to High School which contradicted the part of his statement saying he only went to the third grade. Defendant claims this was permitting the State to impeach its own evidence because it had offered defendant's statement. However, a party offering a document or record is not conclusively bound by every statement in it, especially a self-serving statement, and when there is other evidence to the contrary it may be shown. Kiger v. Terminal Railroad Ass'n of St. Louis, Mo., Mo.Sup., 311 S.W.2d 5, 12; Steele v. Woods, Mo.Sup., 327 S.W.2d 187, 196; Stroud v. United States, 5 Cir., 199 F.2d 923, 925; Weil v. State, 48 Tex.Cr.R. 603, 90 S.W. 644, 646; see also 20 Am.Jur. 771, Sec. 915; 32 C.J.S. Evidence § 1040d, p. 1113. This is certainly true where the defendant also adopted the statement and offered it in evidence. We hold there was no prejudicial error in admitting this testimony of Mrs. Horton.

■■ The other rebuttal testimony was that of Miss Flora Lumpkin (assignment 21) but we find no objection in the transcript to her testimony. In any event, for the same reasons, we find no prejudicial error in admitting her testimony that defendant had a scratch above his wrist on Saturday and told her he got it in a fight on Friday night. (Defendant's statement said he got it in taking the knife from Collie Jean.) Assignments 9 and 10 allege error in allowing part of the closing argu-

ment, claiming the admission of the autopsy record permitted the State to argue (from one of its findings as to lacerations) that rape was defendant's motive and that the argument was highly inflammatory, and an attempt to introduce emotion and passion to unduly influence and prejudice the jury. It is sufficient to say there was no such objection at the trial; but, since we have held the autopsy record admissible, we do not find the argument improper and unwarranted under the evidence.

■ Assignments 11, 12, 13, 14, 15 and 25 allege error in connection with the determination of defendant's prior convictions and sentencing him under the Habitual Criminal Act. Sec. 556.280, as amended Laws 1959, S.B. No. 117, Sec. 1. Defendant's contention of an ex post facto application, because the crime was committed before the effective date of the Act, has been ruled in State v. Morton, Mo.Sup., 338 S.W.2d 858, 861, and State v. Griffin, Mo.Sup., 339 S.W.2d 803, 806, holding this amendment procedural in nature. Following these decisions, we hold that defendant has not been deprived of any constitutional right. Further grounds stated are lack of substantial evidence to support the findings of the court as to prior convictions and admitting the testimony of a police officer concerning it. These claims are based on the fact that defendant was charged herein under the name of James Rufus Payne and the name stated in the prior convictions was Rufus James Payne. It is also claimed that there is a conflict in the records and Mrs. Horton's testimony as to age. However, the officer testified to an admission by defendant that he was the person named in the record of the previous convictions and that he served the sentences imposed. (Two years on each of three convictions running concurrently.) The motion also alleges that this witness's name was not endorsed on the indictment but the transcript shows it was and defendant made no such objection at the trial. Therefore, we hold there was sufficient evidence to support the court's finding of prior convictions. See State v. Baugh, Mo. Sup., 323 S.W.2d 685, 690, and cases cited. These assignments are overruled.

■ Assignment 24 states the jury "did not fairly deliberate on the issues" and "took an inadequate period of time to determine said verdict." The record shows the verdict was returned in 20 minutes after the jury went to the jury room following their dinner recess. This same claim was made in State v. Eckenfels, Mo.Sup., 316 S.W.2d 532, 534, in which we said: "Nor does the fact that the jury deliberated but twenty minutes militate against the verdict or demonstrate that individual jurors did not have sufficient opportunity to weigh the evidence and express their separate opinion; 'When the argument is concluded, the jury may either decide in court or retire for deliberation,' V.A.M.S., Section 546.240. State v. Richmond, 321 Mo. 662, 669, 12 S.W.2d 34, 36." The trial court having full knowledge of trial situation overruled the motion including this ground and therefore we overrule this assignment. The remaining assignments are too general to preserve anything for appellate review. (1, 2, 3 and 4: judgment against the evidence, against the weight of the evidence, against the law, and against the law and the evidence.) Assignment 17 complains that Instruction 2 "was not a true and accurate statement of the law," specifying nothing; 22 alleges bias and prejudice; and 23 alleges admitting incompetent evidence, specifying nothing. While some of these assignments might be considered by the trial court, they fail to meet the requirements of Rule 27.20. See State v. Pruett, Mo., 342 S.W.2d 943, and cases therein cited. We have examined the record as required by Rule 28.02 and find no error respecting the sufficiency of the information, verdict, judgment and sentence.

The judgment is affirmed.

All concur.