STATE of Missouri, Respondent,

v.

Fred Park CHEEK, Appellant.

No. 52060.

Supreme Court of Missouri,
Division No. 1.

March 13, 1967.

Motion for Rehearing or to Transfer to
Court En Banc Denied April 10,
1967.

Norman H. Anderson, Atty. Gen., Jefferson City, Richard G. Altobelli, Sp. Asst. Atty. Gen., St. Louis, for respondent.

George E. Sullivan, O'Fallon, for appellant.

HOLMAN, Presiding Judge.

The amended information in this case charged defendant with murder in the first degree. The jury found him guilty of that crime. Since it was alleged and proved that defendant had been convicted of two prior felonies the court determined his punishment which was fixed at imprisonment in the penitentiary for life. See §§ 559.010, 559.030, and 556.280 (all statutory references are to RSMo 1959, V.A.M.S.). He has appealed. Defendant was represented in the trial court and in this court by counsel of his own choosing. His counsel, however, elected not to file a brief in this court. We will therefore consider the contentions properly raised in his motion

for new trial. State v. Smith, Mo.Sup., 394 S.W.2d 373.

During the early evening of September 18, 1965, defendant drove his Ford Mustang automobile from O'Fallon to St. Charles, Missouri. He was accompanied by Lee English, Walter Thomas, Harvey Huber, and Rose Wells, all of whom lived in the O'Fallon area. While en route to St. Charles defendant was stopped by a highway patrolman and was given a ticket for passing a line of cars on a hill. The patrolman testified that while he smelled an odor of alcohol, the defendant was not intoxicated. About 45 minutes later defendant shot Terry Aldrich in front of the Aldrich home in St. Charles.

Rose Wells testified for the State. She stated that at least three of the men had been drinking when she entered the car at about 8 p. m.; that after arriving in St. Charles the men bought a fifth of Bourbon which they mixed with grapefruit juice and that they were all drinking; that defendant then drove his car to a trailer court (Trio Mobile Homes Park); that when they arrived at a point near the Court they saw a Volkswagen on the road with a boy pushing it; they stopped and Walter Thomas asked if they could help by pushing the car but the boy said no, they could do it themselves; that at that point defendant and Huber insisted that they would help anyway and defendant backed his car up and then ran it forward and hit the Volkswagen from the rear; that he backed up again and hit the Volkswagen a second time; that a boy then got out of the Volkswagen and came around to the driver's side of the Mustang and reached in, pulled defendant's shirt, and asked him what he thought he was doing; that defendant and Huber both got out of the car—Huber carrying a .38 caliber revolver in his hand and defendant carrying a .22 caliber Derringer; that she then heard a shot and a girl scream; that the men got back in the car and defendant said, "I shot the guy in the throat"; that they then started back toward O'Fallon and defendant gave the Derringer to Huber, who

fired the other shot out the car window, and said he would take it to work the next day and melt it down with a welding torch.

Coleen Skelly testified that on the night in question she had a date with Terry Aldrich and that they were double-dating with Don Campbell and Linda Crosley; that they were all at the home of Terry Aldrich's parents and decided to go play miniature golf; that they started to leave in Don's Volkswagen but the car would not start; that one of the boys was pushing it when some people in a Mustang drove alongside the Volkswagen and asked if we needed help; that Don said "No, we can manage it ourselves," and someone in the Mustang said, "We are going to help you anyway"; and that they backed the car up and drove into the Volkswagen. "Then we all got out of the car" and the Mustang hit it again "real hard"; that she then looked at Terry who was standing in the street and about ten seconds later she saw the flash of a gun in front of him and Terry fell; that Terry was standing still at the time he was shot; that she saw that Terry was bleeding and ran to his home nearby and reported that Terry had been shot.

Somewhat similar testimony was given by Linda Crosley and by Donald Campbell. Donald also testified that Terry may have grabbed defendant's shirt when he walked to the driver's window of the Mustang, and that Terry then walked back towards Huber before the shot was fired but was not moving at the time he was shot.

Terry, a 20-year-old college student, was taken at once to the hospital where he died later that night. According to the testimony of Dr. Roberts who performed an autopsy there were powder burns on deceased's neck, and the bullet punctured the right jugular vein so that blood filled the windpipe and lungs of the deceased. In answer to a hypothetical question Dr. Roberts expressed the opinion that deceased died as a result of the gunshot wound.

Linda Crosley had been able to get a part of the license number on the Mustang before it left the scene and the car was located about midnight in Wentzville, at which time defendant, Huber, and Thomas were arrested. It later developed that Huber had thrown the revolver out of the car at the time of his arrest and it was found at that place early the next morning. An officer testified that defendant denied knowing anything about the shooting at the time of his arrest.

The State obtained a tape recorded joint statement of defendant and Huber which was admitted in evidence and heard by the jury. We will not recite that testimony herein as defendant's version thereof did not vary greatly from his testimony at the trial, which is hereinafter set out.

Defendant testified that he had stolen the .38 caliber revolver, which Huber had on the night of the killing, about three weeks before from a man called "Herb"; that he had purchased the Derringer in St. Louis about three years before the shooting; that in 1962 he dropped that gun and broke the pin which held the trigger; that he repaired it by replacing the pin with a small wire brad, and since that time the gun had been "real easy to trigger." He further testified that on the night of the shooting, when the boy refused their offer to push the Volkswagen, someone said, "Let's give them a push anyway"; that he backed the car up and pulled in behind the other car and "let it roll down and bump into" the Volkswagen; that at that time a boy, whom he later learned was Terry Aldrich, came back to his car, grabbed and tore his shirt, spilled his drink, and then said "Are you guys looking for trouble?"; that Huber got out and walked around the back of the car and the boy then let go of him and started back toward Huber; that he then opened his door and went back to where Aldrich was; that before getting out of the car he had obtained the Derringer from between the seat and the transmission; that he then walked toward Aldrich and put his hand on his arm and "I started to say

something to him and had the gun in my hand, and when he turned around he bumped into me—turned into me—and when he did the gun went off"; that somebody said, "Let's get in the car"; and "we ran and got in the car and took off."

Defendant further testified that he knew that Huber, who was intoxicated, had the .38 revolver when he got out of the car; that when he first got out of the car he saw that Huber was pointing the gun at Aldrich.

On cross-examination he stated that his Derringer would not go off unless it was "cocked" and that he did not know it was cocked at the time of the shooting.

Both Walter Thomas and Lee English testified for the defendant. They each stated that when defendant got back in the car he said he didn't mean to shoot the boy. English testified that in returning from St. Charles to O'Fallon defendant used country roads and "drove like a maniac."

Additional evidence will be hereinafter stated in connection with our discussion of points raised on this appeal.

■ Defendant's first assignment is that the court erred in submitting murder in the first degree. He says that the intentional killing of a human being with a deadly weapon is presumed to be second degree murder; that there was no proof of deliberation and hence the evidence did not overcome the presumption of second degree murder and a submission of first degree murder was not warranted. We do not agree. In this case the evidence was rather fully developed by eyewitnesses. There was evidence from which the jury reasonably could have found that after deceased grabbed defendant's shirt defendant picked up the gun, tried to stop his car from rolling forward, got out of the Mustang, traveled a distance of at least ten feet, raised the gun so that it was pointing at deceased, and shot him in the neck while he stood motionless. That was ample evidence to reasonably support a finding of deliberation. The point is ruled adversely to defendant.

The Court gave instructions authorizing a conviction for murder in the first degree, second degree, and manslaughter. At the request of defendant an instruction was given which directed an acquittal upon a finding that the killing was accidental. In the first degree submission the jury was required to find that defendant shot the deceased "wilfully, feloniously, deliberately, premeditatedly and of his malice aforethought." For his second assignment defendant says the instruction was erroneous because the definition of "deliberately" was incomplete. Since the quoted words have overlapping meanings, we set out the definition of all of them, as follows: " 'Wilfully', as used in these instructions, means intentionally, not accidentally. 'Feloniously' means wickedly and against the admonition of the law. 'Deliberately' means in a cool state of blood; that is, not in a heat of passion caused by some just provocation to passion. 'Premeditatedly' means thought of beforehand for any length of time, however short. 'Malice', in its legal sense and as used in these instructions, does not mean mere spite, ill will, hatred or dislike, as it is ordinarily understood, but it means that condition of the mind which prompts a person to intentionally take the life of another without just cause, justification or excuse, and signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief. 'Malice aforethought' means malice with premeditation."

■ In his motion for new trial defendant cites State v. Evans, 158 Mo. 589, 59 S.W. 994, in which (although not reversed for that reason) a similar definition of "deliberately" was said to be erroneous because it did not include the words considered or reflected upon. However, we note that in 11 Words and Phrases, p. 632, the precise definition here involved is given with thirteen Missouri cases cited in support thereof. See also State v. Bobbst,

269 Mo. 214, 190 S.W. 257, and State v. Hershon, 329 Mo. 469, 45 S.W.2d 60. We are inclined to the view that, in this instance, the definition would have been more complete, and hence preferable, if it had included words indicating that the act was the result of a formed design arrived at after some degree of reflection. However, under the facts of this case and upon a consideration of all the definitions in the instruction, we are convinced that the omission would not constitute reversible error. Under the various definitions in the instruction (considered together, as they must be) the jury was required to find that the act was intentionally done after having been thought of beforehand while defendant was in a "cool state of the blood." We think that was sufficient and that the jury would not have been misled as to the requirements. Since there was no prejudicial error this assignment is disallowed.

■ The next assignment is that the trial court should have granted defendant a new trial because the jury reached a verdict 45 minutes after the case was submitted to it, thus indicating that the jurors were biased and prejudiced against defendant. There is no merit in that contention. Section 546.240 provides that "[w]hen the argument is concluded, the jury may either decide in court or retire for deliberation. * * *" *In discussing a similar contention we stated:* "Nor does the fact that the jury deliberated but twenty minutes militate against the verdict or demonstrate that individual jurors did not have sufficient opportunity to weigh the evidence and express their separate opinions." State v. Eckenfels, Mo.Sup., 316 S.W.2d 532, 534. See also State v. Payne, Mo.Sup., 342 S.W. 2d 950 [11]. In the case at bar the jury was not required to fix the punishment and the principal issue it had to decide was whether the shooting was intentional or accidental. We see nothing in the circumstances to indicate that the jury should have deliberated longer or that it was biased or prejudiced against defendant.

As indicated, we rule this point against defendant.

■ Defendant's fourth assignment is that the court erred in permitting an argument by the prosecuting attorney to the effect that "something had to be done about the defendant and the persons with him at the time of this incident and that if they did not do something to the defendant he would commit other crimes." We have read the entire argument of the prosecuting attorney and we do not find any statement of that kind. He did make a rather strong plea for law enforcement and asked for a verdict which would deter defendant and others from the commission of crimes "like this." That kind of argument is proper and we find no error in that regard. State v. Gridley, Mo.Sup., 353 S.W.2d 705 [11]. It is also contended that counsel for the State "improperly argued the prior conviction of the defendant and in connection therewith, the evidence of another crime for which there was no conviction, i. e., that prior to this homicide, some two weeks previous, the defendant had taken a gun from the home of another individual without his permission." In reading the argument we find that the portion in which reference is made to other crimes was not objected to and hence the alleged error is not preserved for review. Moreover, we note that the mention of defendant's other convictions (which defendant admitted in his testimony) was made in connection with an argument concerning defendant's credibility which is entirely proper. In that connection defendant incidentally complains of the fact that the State was permitted to show on his cross-examination that he had taken a revolver without the permission of the owner, but we find that there was no objection to that testimony and defendant is therefore in no position to assign error in that regard.

■ Complaint is also made of the fact that a photograph of deceased was admitted in evidence and that his mother, in her testimony, volunteered the fact that

deceased was her only son. While the photograph was admitted, the court did not permit it to be shown to the jury. When the statement was made that deceased was the only son of the witness defendant requested that the remark be stricken and the jury told to disregard it. The court granted the relief with the following statement: "Yes, the voluntary remark of the witness in the last statement was improper and will be ordered stricken and the jury instructed to disregard that statement." Since the photograph was not shown to the jury, and the other requested relief was fully granted, we rule that no prejudicial error occurred.

■ A mailbox was located near the place where deceased was shot and the bullet apparently went through it. A picture of the mailbox, and also the mailbox itself, were admitted in evidence. In his next assignment defendant contends that the court erred in "allowing the counsel for the State to argue facts not in evidence with regard to the mailbox with the bullet hole in it and refused to instruct the jury to disregard the prosecuting attorney's statements in the final half of his closing argument with regard to the trajectory of the bullet hole in the mailbox as being an evidentiary factor indicating the flight of the bullet, and further refused to the counsel for the defendant, even though he requested it, additional time to reply to the new argument and entirely new theory which counsel for the State brought up for the first time in the second half of his closing argument." We find no merit in that contention. In regard to the suggestion that the argument related to new matter mentioned for the first time in the closing argument, the court ruled that it was proper rebuttal to defendant's argument. Since defendant has not seen fit to include his argument in the transcript we must assume that the court was correct in that ruling. Defendant also says that there was no evidence as to the height of the mailbox from the ground, nor of the dis-

tance from the mailbox to the point where the shot was fired, but we note that the court sustained defendant's objections to statements concerning "the height and the distance." As indicated, this point is overruled.

■ The next assignment is that "the court erred in permitting counsel for the State to inquire into evidence of another crime, i. e., the alleged threat by one Huber against witness Wells that he would kill her if she ratted on 'Chico', for the reason that there was no showing that the defendant had anything to do with this threat or that he acquiesced in it or was in any way involved and the result of such inquiry further heightened and inflamed the bias and prejudice and passion of the jury and when coupled with the entire manner in which the counsel for the State conducted this trial resulted in the biased and prejudiced and passion-engendered verdict." That point relates to testimony by Walter Thomas to the effect that after they had returned to O'Fallon, and Rose was seated in the front seat of the car between Huber and defendant, Huber put a gun to Rose's neck and said he would kill her if she told or "ratted" on defendant. Assuming (but not deciding) that the evidence was inadmissible, we hold that proof that Huber committed a crime would not warrant a reversal of defendant's conviction. Most complaints of this nature, and the cases relating thereto, concern proof of other crimes by a defendant. The evidence here in question indicates that Huber may have been guilty of exhibiting a deadly weapon in a threatening manner, as proscribed by § 564.610, but it is conceded that defendant had no connection with the commission of that crime. We have concluded that it was not reversible error to permit proof of another crime by one other than defendant even though it was in defendant's presence and related to a matter in which he may have had an interest. The point is disallowed.

■ Defendant next contends that the court erred in not permitting him to testify as to what he was going to do when he got out of the car. That assignment apparently relates to the following portion of defendant's testimony: "Q And it was at this point that you got out of the car? A Yes. Q What were you going to do? Mr. Dalton: Your Honor, I object to that, again. I think it is self-serving. The Court: Yes, I think you can ask him what he did do; not what he was going to do. The objection will be sustained. Q (by Mr. Sullivan) What did you do?" As shown by the foregoing, defendant made no offer of proof as to what his answer would have been, and in that situation the alleged error is not before us for review. State v. Spikes, Mo.Sup., 367 S.W. 2d 515 [1]; Thayer v. Sommer, Mo.Sup., 356 S.W.2d 72 [11, 12].

■ It is also defendant's contention that the court erred in failing to give an instruction on manslaughter by culpable negligence as a part of the law of the case. We have read that assignment many times and we cannot find any facts stated or any theory discussed which would have supported a culpable negligence submission. It would appear from defendant's discussion of a case he cites that he would base the submission upon the fact that the gun was accidentally discharged. That conclusionary statement would obviously not support the submission of "culpable negligence" which has been defined to mean "negligence of such reckless or wanton character as to indicate an utter indifference to the life of another." State v. Whipkey, 361 Mo. 1008, 238 S.W.2d 374, 376.

■ Supreme Court Rule 27.20(a) provides that a motion for new trial "must set forth in detail and with particularity, in separate numbered paragraphs, the specific grounds or causes therefor." In discussing that rule we recently said: "Among other assignments in the motion for a new trial is the contention that the court erred

in refusing to instruct on manslaughter; that such an instruction was requested and refused and that the facts in the case warranted such an instruction. We think this assignment wholly insufficient, under the facts of this case, to comply with Supreme Court Rule 27.20 in that it does not set forth in detail and with particularity the specific grounds or cause therefor, in that it does not indicate in any manner what facts in evidence were considered sufficient to warrant such an instruction." State v. Luttrell, Mo.Sup., 366 S.W.2d 453, 459. To like effect, see also State v. Burnett, 365 Mo. 1060, 293 S.W.2d 335 [15], State v. Kukovich, Mo.Sup., 380 S.W.2d 324 [10], State v. Sprout, Mo.Sup., 365 S.W.2d 572 [9], State v. Pope, Mo. Sup., 364 S.W.2d 564 [2], and State v. Benjamin, Mo.Sup., 309 S.W.2d 602 [8]. As we have indicated, defendant in the case before us, has completely failed to specify any *facts* in evidence which would have supported a submission of manslaughter by culpable negligence. In that situation we rule that this assignment wholly fails to comply with S.Ct.Rule 27.-20(a) and hence does not preserve anything for review.

The court gave the following manslaughter instruction: "The court instructs the jury that 'manslaughter' is the killing of a human being not herein declared to be murder or excusable or justifiable homicide, and the court instructs the jury that if you find and believe from the evidence that the defendant killed the deceased while in the heat of passion on a reasonable provocation, without malice and without premeditation, as these terms are hereinbefore explained, and under circumstances not constituting justifiable or excusable homicide, as defined in other instructions, but that defendant in a sudden passion, on a reasonable provocation, intentionally shot and killed the deceased, without malice or premeditation, then the jury should find defendant guilty of manslaughter. Unless you so find the facts, you will find the defendant not guilty of manslaughter."

Defendant says the instruction is erroneous because it did not contain a preface stating that if the jury found defendant not guilty of murder in the second degree it should then consider whether he was guilty of manslaughter. While we think such a statement would have been desirable, we do not consider its omission to be prejudicial. The instruction was complete and the jury would undoubtedly know that it could not find defendant guilty of more than one grade of homicide. Error is also assigned because the instruction contains the exception, "under circumstances not constituting justifiable or excusable homicide, as defined in other instructions," when justifiable or excusable homicide is not defined in any other instruction. Under the circumstances of this case we do not consider that omission to be reversible error.

Defendant says the failure of the instructions to define those terms made the manslaughter instruction confusing and prejudicial, but he does not clearly specify the reason it does so. He does not contend that if the instructions had contained those definitions the jury would have found him guilty of voluntary manslaughter and hence would not have found him guilty of first degree murder. It would be difficult to reasonably so contend because the terms that were not defined did not relate to elements required for a finding of guilt but referred to defenses which, if so found, would have required an acquittal of manslaughter. In that connection it should be noted that justifiable homicide means a killing in self-defense and that there is no contention that such was a defense in this case. The reference to that defense was surplusage and there was no need to define it. State v. Westmoreland, Mo.Sup., 126 S.W.2d 202 [5]. In contending that "excusable homicide" should have been defined, defendant says, "How could the jury know that if they believed the gun was discharged accidentally they could * * * acquit the defendant?" A short answer to that question is that the court, at defendant's request, gave an instruction to the effect that the defense in the case was that Aldrich came to his death by accident and that if the jury found that his death was accidental it should find defendant not guilty. We have considered the contentions advanced by defendant as to why the omissions under consideration would constitute prejudicial error and have decided that they would not warrant such a conclusion.

An examination of the record as required by S.Ct.Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

All concur.