

# Missouri Court of Appeals

## Southern District

### Division Two

STATE OF MISSOURI,           )
                                   )

      Plaintiff-Respondent,    )
                                   )

v.                             )    No. SD31570
                                   )    Filed: 6-11-14

MICHAEL EDWARD AMICK,   )
                                   )

      Defendant-Appellant.    )

### APPEAL FROM THE CIRCUIT COURT OF OREGON COUNTY

Honorable John M. Price, Senior Judge

### **AFFIRMED**

Michael Amick (Defendant) was charged by amended information with committing the class A felony of murder in the first degree and the class C felony of arson in the second degree. *See* §§ 565.020, 569.050.[1] These charges stemmed from the death of Leona Maxine Vaughan (Victim), Defendant's grandmother-in-law. Victim was shot six times in the head at her daughter's house, which thereafter burned to the ground. After a jury trial, Defendant was found guilty of second-degree arson as charged. *See* § 569.050. With respect to the homicide count, Defendant was found guilty of the lesser-

---

[1] All statutory references are to RSMo (2000). All rule references are to Missouri Court Rules (2013).

included offense of second-degree murder. *See* § 565.021. Pursuant to a pre-verdict agreement, Defendant was sentenced to concurrent sentences of life imprisonment for murder and seven years for arson. On appeal, Defendant contends: (1) the trial court erred by failing to grant a mistrial when a juror had to be dismissed for health reasons after deliberations had begun; (2) there was insufficient evidence to convict Defendant of arson; (3) the trial court plainly erred by not *sua sponte* declaring a mistrial following the prosecutor's closing argument; (4) the trial court abused its discretion by admitting rebuttal evidence; and (5) the trial court plainly erred by commenting on the evidence. Finding no merit in any of these contentions, we affirm.

Defendant does not contest the sufficiency of the evidence to support his conviction for second-degree murder. "We consider the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, and we reject all contrary evidence and inferences." **State v. Campbell**, 122 S.W.3d 736, 737 (Mo. App. 2004). Viewed from that perspective, we briefly summarize the relevant facts.

On December 2, 2008, Victim was residing with her daughter, Jackie Risner (Jackie), at Jackie's house in Myrtle, Missouri. Around 10:30 a.m., Jackie left for work. She was accompanied by her son, Josh Lane (Lane). Victim remained at the house alone.

Jackie's ex-husband, Kent Risner (Kent), spoke with Victim by telephone at 10:56 a.m. That phone call – which Kent described as uncharacteristically short – lasted two minutes.

Around 11:00 a.m., Jake Mayberry (Mayberry) left his parents' house to drive to the local convenience store located six miles away. Mayberry knew Jackie, who only lived one mile away. As Mayberry drove past Jackie's house, he noticed Defendant's

2

truck was parked out front. Mayberry drove on to the convenience store, where he purchased a few items. He left there at 11:21 a.m. On the return trip, Mayberry again drove past Jackie's house and noticed smoke emanating from overlaps in the tin pieces of the roof. Mayberry reported what he had seen to his father, Jackie and Josh. All three rushed to the scene, but they were unable to control the fire or locate Victim.[2] Police were notified of the fire.

After the blaze was extinguished, Victim's body was found inside the house. An autopsy revealed that she was killed before the fire started. The cause of death was six gunshot wounds to the head. Six bullet fragments were recovered, which were consistent with .22 caliber rounds.

On the same day Victim was killed, Defendant called the Bank of Thayer and asked a bank official if there was credit life insurance on a $20,637.80 car loan Victim had received. Approximately $15,000 of the loan proceeds was supposed to have been used by Victim to purchase a van from Defendant and his wife. Defendant was told that there was credit life insurance on the loan and that the $18,591.99 balance would be paid off. Records revealed that, although Victim took out the car loan, Defendant had been making the payments. In addition, the loan had been issued by the bank under false pretenses because Defendant never transferred the van's title to Victim. As a result of Victim's death, Defendant got to keep the $15,000 loan payment and ownership of the van.

---

[2] The fire was extensive. State Fire Marshal Michael Johnson testified that more than 95% of Jackie's house was burned completely to floor level or below. Consequently, he was unable to conclude where or how the fire started.

Two days after Victim's death, Defendant failed to show up for a scheduled interview with police. Sheriff Tim Ward went to Defendant's house, but he was not there. Defendant's truck, however, was present. Sheriff Ward observed that the bed of Defendant's truck contained a chainsaw, a cutting torch, an oxygen tank and an acetylene tank.

The following day, Sheriff Ward returned to Defendant's house, accompanied by other law enforcement personnel, with a search warrant. During the search of Defendant's house, officers recovered .22 caliber ammunition. While searching an adjacent field, Sheriff Ward also observed a burned spot on the ground which contained metal drippings and a hammer spur from a revolver. Officers searched a nearby pond using a magnet and some rope. They retrieved a revolver frame, a cylinder and a portion of the barrel, which had been cut lengthwise. Later analysis revealed that the recovered revolver pieces were each consistent with a .22 caliber firearm. The revolver appeared to have been cut apart with a cutting torch.

Defendant was eventually arrested. While in jail, Defendant made various incriminating statements to another inmate. These included: (1) Victim owed Defendant money, which should have been paid a long time ago; (2) "the bitch" [Victim] had it coming for a long time; and (3) Defendant threw a gun in a pond.

Additional facts necessary to the disposition of the case are included below as we address Defendant's five points on appeal. For ease of analysis, we will review Defendant's points out of order.

4

*Point II – Sufficiency of the Evidence*

In Point II, Defendant challenges his conviction for arson in the second degree. Defendant contends the trial court erred by overruling Defendant's motion for judgment of acquittal at the close of all of the evidence. The standard of review for a motion for judgment of acquittal is the same as the standard used for reviewing a challenge to the sufficiency of the evidence. *State v. McQuary*, 173 S.W.3d 663, 666-67 (Mo. App. 2005). "[W]e view the evidence in the light most favorable to the verdict, making all reasonable inferences therefrom, and disregard all evidence and inferences contrary to that finding." *State v. Uptegrove*, 330 S.W.3d 586, 590 (Mo. App. 2011). Our task is to determine whether there is sufficient evidence from which a reasonable juror could have found Defendant guilty of second-degree arson beyond a reasonable doubt. *See id*.

As relevant here, arson in the second degree requires proof that "1) a building was on fire, 2) the fire was of an incendiary origin, and 3) the defendant participated in commission of the crime." *State v. Bolds*, 913 S.W.2d 393, 397 (Mo. App. 1996).[3] Defendant argues that:

> the state failed to prove beyond a reasonable doubt that [Defendant] knowingly started the fire or that the fire was of incendiary origin … because the State Fire Marshall Investigator did not find any traces of accelerants or pour patterns or anything of that nature, he was unable to determine where the fire started or its cause, and he could not say that the fire was the result of arson.

That argument is misdirected for two reasons.

---

[3] Section 569.050.1 states that "[a] person commits the crime of arson in the second degree when he knowingly damages a building or inhabitable structure by starting a fire or causing an explosion."

5

First, the applicable standard of review requires us to ignore all evidence and inferences contrary to the jury's verdict. Therefore, we must ignore the fire marshal's testimony.

Second, "[a]rson is a crime usually committed in stealth and seldom in the view of witnesses and, hence, guilt must ordinarily be proven by circumstantial evidence. The incendiary origin of a fire and the guilty agency of the accused may be established by circumstantial evidence." *State v. Simpson*, 606 S.W.2d 514, 518 (Mo. App. 1980).

> [Evidence of incendiary origin] does not mean that there must be proof, necessarily, that some highly combustible material was employed, although that is the usual method employed and of which there is usually some evidence. The rule can only mean that there must be some evidence, direct or circumstantial, that the person charged intentionally started or set the property on fire.

*State v. Paglino*, 291 S.W.2d 850, 857 (Mo. 1956).

Viewed in the light most favorable to the verdict, there was sufficient evidence from which a juror could find beyond a reasonable doubt that Jackie's house was on fire, the fire was of incendiary origin and Defendant participated in the commission of the crime. *See* **Bolds**, 913 S.W.2d at 397. Victim was alive and the house was not on fire when Jackie left at 10:30 a.m. Approximately 25 minutes later, Kent had an unusually brief telephone conversation with Victim. About five minutes later, Mayberry observed Defendant's truck at Jackie's house. These facts support the reasonable inference that Defendant had been inside the house when Kent called. Defendant then murdered Victim by shooting her six times in the head with a .22 revolver.[4] According to the forensic pathologist, Victim was killed before the fire started. When Mayberry drove back by

---

[4] Defendant does not challenge the sufficiency of the evidence to support his conviction for second-degree murder.

Jackie's house at 11:21 a.m., it was already burning. The rapidity with which the fire started, the intensity of the blaze and the near-complete destruction of the house supports the reasonable inference that the fire was of incendiary origin and was intended to destroy evidence of Victim's murder and Defendant's involvement therein. This reasonable inference is strongly supported by evidence that Defendant also tried to destroy and dispose of the revolver he used to murder Victim. Accordingly, Point II is denied.

*Point V – Comments Regarding the Evidence*

In Point V, Defendant contends that the trial court plainly erred by "abandoning its duty of neutrality and injecting itself in the proceeding" when it commented in the jury's presence that Mayberry, in regard to his identification of Defendant's truck, had "answered consistently each time" and "established he can describe the vehicle." This point arises out of the following events during the prosecutor's examination of Mayberry:

Q      [By the prosecutor]  And when you looked up [at Victim's house] on this occasion, did you see any vehicles?

A      [By Mayberry]  Yes, [Defendant]'s truck is there.

Q      You saw [Defendant]'s truck there?

A      Yes, sir.

Q      Now, you said his truck is there.  Had you seen him in his truck before on various occasions?

A      Oh, yes.

Q      Around town?

A      Yeah.

Q      And you knew what his truck looked like?

A      Yes, sir.

7

Q      And we'll come back to that in a little bit.  But is there any doubt in your mind that the truck you saw at the house was his truck?

A      No, sir.

….

Q      And when you drive by this truck, I mean, are you staring at it intently trying to mark every dent and discoloration, or are you just looking at it real quick as you drive by?

A      No, sir.  I was just looking at it and noticed the truck.

Q      But you know without a doubt in your mind it was his truck?

[DEFENSE
COUNSEL]:              He's leading this witness, and also that's a cumulative, repetitive question, Your Honor.

THE COURT:            As to leading, sustained.

[DEFENSE
COUNSEL]:              Thank you.

Q      (By [the prosecutor])  Was there any doubt in your mind as you drove by –

[DEFENSE
COUNSEL]:              Asked and answered three times now, Your Honor.  It's repetitious and he is basically trying to rehabilitate his own witness by asking three times.

THE COURT:            *He's answered consistently each time* so he's not rehabilitating, but your objection is sustained.

[PROSECUTOR]:      Judge, I'll move on.  I'm not trying to delay things here.

[DEFENSE
COUNSEL]:              Well, the objection is sustained, Your Honor.  Ask that the prosecutor be asked not to ask these questions over and over again.

THE COURT:            *He's established he can describe the vehicle.*

[DEFENSE
COUNSEL]:              Thank you.

8

THE COURT:     Proceed.

(Italic emphasis added.)

There was no objection to the court's statements, so Defendant seeks plain error review pursuant to Rule 30.20. Plain error review is discretionary. *State v. Edberg*, 185 S.W.3d 290, 293 (Mo. App. 2006). A defendant is not entitled to relief pursuant to the plain error rule unless he demonstrates that the error so substantially affected the defendant's rights that a manifest injustice or a miscarriage of justice would inexorably result absent a correction of the error. *State v. Oplinger*, 193 S.W.3d 766, 770 (Mo. App. 2006).

Plain error review involves a two-step analysis. *State v. Mack*, 301 S.W.3d 90, 95 (Mo. App. 2010). First, we determine whether the trial court committed evident, obvious and clear error affecting the defendant's substantial rights. *Id*. If the defendant does not get past the first step, our inquiry ends. *Id*. If we determine that a plain error occurred, however, we then must decide whether the error actually resulted in manifest injustice or a miscarriage of justice. *Id*. "A claim of plain error places a much greater burden on a defendant than an assertion of prejudicial error." *State v. Wright*, 216 S.W.3d 196, 199 (Mo. App. 2007). The outcome of plain error review, furthermore, "depends heavily on the specific facts and circumstances of each case." *State v. Roper*, 136 S.W.3d 891, 900 (Mo. App. 2004).

Defendant asserts that "the trial court's comments on the evidence were inherently prejudicial and added substantive support of the state's case and Mayberry's credibility and ability to identify the truck[.]" We disagree.

> When determining the propriety of a trial court's comments on the
> evidence, we consider whether (1) the comment was volunteered by the

9

trial court, (2) was not made in response to an objection as part of the trial court's ruling, (3) was made in the presence of the jury[,] (4) could have been construed by the jury to the prejudice of defendant, or (5) indicated to the jury that it was not to reach its own determination of the facts.

*State v. Harrison*, 213 S.W.3d 58, 66-67 (Mo. App. 2006). Our task is to determine "whether the trial court's conduct is such as to prejudice the minds of the jury against the defendant thereby depriving the defendant of a fair and impartial trial." *State v. Jackson*, 836 S.W.2d 1, 6 (Mo. App. 1992). Based upon our review of the record, the trial court's statements did not deprive Defendant of a fair and impartial trial.

Before the trial court said anything, Mayberry had testified four times that he saw Defendant's truck sitting outside Jackie's house when he drove by around 11:00 a.m. The court's first statement was not volunteered. Instead, the judge was responding to an objection by defense counsel. The court's statement that Mayberry had answered consistently each time simply explained to defense counsel that: (1) his rehabilitation objection had no basis; but (2) the court was sustaining the objection that the question was repetitious. This is permissible. *See State v. Thomas*, 791 S.W.2d 861, 862-63 (Mo. App. 1990) (stating that a judge may summarize evidence in explaining a ruling, as long as it is not a statement of the facts as a matter of law). The court's statement was not prejudicial to Defendant, nor did it indicate to the jurors that they should not determine the facts for themselves. The court's second statement also was not volunteered and was made while sustaining defense counsel's objections to any more questions by the prosecutor on that subject. The court's comment simply advised the prosecutor that he should move on because the witness had repeatedly described the truck he saw at Jackie's house. The court's second comment was permissible. *See Thomas*, 791 S.W.2d at 862-63. The comment did not prejudice Defendant or inform jurors that they could not

determine for themselves the credibility of Mayberry's testimony. Because Defendant has failed to demonstrate that the trial court committed evident, obvious and clear error affecting the defendant's substantial rights, our inquiry ends. *Mack*, 301 S.W.3d at 95. Point V is denied.

*Point IV – Rebuttal Evidence*

In Point IV, Defendant contends the trial court abused its discretion in admitting Ex. 43 – a recorded phone call between Defendant and Deanna Amick (Deanna) – to rebut the testimony of Christopher Amick (Christopher).[5] Deanna and Christopher are Defendant's sister and brother, respectively. This point arises out of the following events at trial.

One contested issue at trial was which photographs of Defendant's truck accurately depicted its appearance. The night of Victim's murder, a group of investigators, including Oregon County Chief Deputy Eric King and State Fire Marshal Kass Brazeal, interviewed Defendant at his residence. While there, State Fire Marshal Brazeal took three pictures of Defendant's truck, which the trial court admitted into evidence as Exs. 9, 10 and 11.[6]

Thereafter, the police attempted to locate Defendant's truck for further examination, but Defendant's family was not forthcoming as to its location. During

---

[5] For clarity, we will refer to these persons by their first names. No disrespect is intended.

[6] Exs. 9 and 10, both of which Mayberry testified were fair and accurate representations of Defendant's truck, were pictures of the front and rear of the truck, respectively. Ex. 9 included the truck's license plate number, which Department of Revenue records indicated was registered to Defendant and his wife. Ex. 11 was of one of the truck's wheels, which also depicted that the wheel well had an attached black fender.

11

Christopher's direct examination, the trial court admitted Exs. Q and R into evidence. These exhibits were photographs which Christopher testified were of Defendant's truck. On cross-examination, Christopher testified that he moved the truck to a friend's house in Pocahontas, Arkansas approximately a year prior to the trial. Christopher also testified that the truck had been in his possession since the date the crimes at issue occurred and that no one had altered the truck. He agreed, however, that there were differences between the appearance of the vehicle shown in Exs. 9-11 and the vehicle shown in Exs. Q and R. [7] On redirect, Christopher testified that nobody was hiding Defendant's truck.

When the defense rested, the State offered Ex. 43 to rebut Christopher's testimony. This exhibit was an audiotape of a March 3, 2011 conversation between Defendant, who was calling from jail, and Deanna. Defense counsel objected that Ex. 43 was not proper rebuttal and was irrelevant. Those objections were overruled, and the audiotape was played for the jury. [8] During the conversation, Deanna told Defendant that, upon inquiry from law enforcement, she had denied knowledge of the location of Defendant's truck. In relevant part, the following colloquy ensued:

Deanna:     Well, I don't think I said anything I shouldn't have. Do you?

---

[7] Exs. Q and R were not included in the record on appeal. However, on cross-examination, Christopher acknowledged that the truck depicted in the State's photographs had a black fender, while the truck depicted in Defendant's photographs had fenders that were the same color as the body of the truck (described as being pewter or silver).

[8] Although Ex. 43 was played for the jury, the court reporter did not transcribe the conversation. Therefore, we have transcribed the relevant portions of that exhibit for the purpose of addressing Defendant's point.

12

Defendant:     No, no. It's just – it's kind of hard to subpoena somebody to make 'em produce a truck when you don't know who to subpoena. Huh?

Deanna:     That's right. Yep.

….

Deanna:     I don't know a thing about it, and I choose not to know a thing about it.

Defendant:     Yep.

Deanna:     I know the truck is gone, and that was my decision. I'm the one who said, "that truck needs to disappear." That if they can't fucking identify it with – you know, an accurate statement, and I said that before the arraignment. That if he couldn't give an accurate, er, description of it, that that sucker needs to disappear. Because that way it didn't – wasn't sitting around for God and everybody to be able to just study it.

….

Deanna:     I don't know where it's at. I don't care where it's at. I don't know who has it. And, I do not regret telling my family that that truck needed to go and disappear.

Defendant:     Yep.

Deanna:     I do not regret it. When your life is on the line, and people are framing you for something that you didn't do, I don't fucking regret it.

Defendant:     Nope. I don't either.

Defendant argues that: (1) Ex. 43 was not proper rebuttal evidence; and (2) Ex. 43 was not relevant. We disagree.

"The determination of the scope of rebuttal is soundly within the trial court's discretion." **State v. Hamilton**, 892 S.W.2d 371, 379 (Mo. App. 1995). Similarly, "[a] trial court is vested with broad discretion in determining the relevance of proffered

13

evidence." ***State v. Lloyd***, 205 S.W.3d 893, 902 (Mo. App. 2006). An appellate court will not interfere with that discretion unless the trial court's ruling is against the logic of the circumstances and is "so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." ***Hancock v. Shook***, 100 S.W.3d 786, 795 (Mo. banc 2003).

Defendant argues that Ex. 43 was not proper rebuttal evidence. "Rebuttal evidence may directly or indirectly explain, counteract, repel, or disprove a defendant's evidence either directly or by implication." ***Hamilton***, 892 S.W.2d at 379. Here, Christopher testified that the truck had been in his possession since the murder. He had moved the truck to a friend's house in Arkansas a year before trial, but he denied that he did so to hide the truck. Ex. 43 served to directly counteract, repel or disprove Christopher's testimony. On that audiotape, Deanna said that she had told "her family" that Defendant's truck "needed to go and disappear" so it could not be studied, presumably by law enforcement or the prosecutor. This evidence cast doubt on Christopher's credibility because it undermined his testimony that no one was trying to hide Defendant's truck. Accordingly, the trial court did not abuse its discretion by deciding that Ex. 43 was admissible as rebuttal evidence.

Defendant next argues that Ex. 43 was not relevant because "there was no evidence that [Defendant] had anything to do with his truck being moved to Arkansas[.]" That argument is misdirected. Evidence is relevant if it tends to make the existence of a material fact more or less probable. ***State v. Anderson***, 76 S.W.3d 275, 276 (Mo. banc 2002). "The interest or bias of a witness in relation to or feeling toward a party is relevant." ***State v. Calmese***, 541 S.W.2d 349, 351 (Mo. App. 1976). Ex. 43 was relevant

14

because it bore on the credibility of Christopher's testimony that Exs. Q and R depicted Defendant's truck and that no one had been hiding that vehicle from the police or the prosecutor. Therefore, the trial court did not abuse its broad discretion in admitting that exhibit. Point IV is denied.

*Point III – Closing Argument*

In Point III, Defendant challenges certain comments by the prosecutor during closing argument. The following additional facts are relevant to this point.

As noted above, one issue in the case was whether Exs. 9-11 and Exs. Q and R depicted the same vehicle. In the audiotape admitted as Ex. 43, Deanna stated that she had told "her family" that Defendant's truck "needed to go and disappear." Christopher, who was in possession of Defendant's truck, testified that Exs. Q and R were accurate representations of Defendant's truck. These photographs, however, depicted a truck with certain characteristics that were different than the truck depicted in Exs. 9-11.

During the opening portion of the State's closing argument, the prosecutor noted defense counsel had attempted to portray Mayberry as a liar. The prosecutor then stated:[9]

> Ladies and gentlemen, *they're creating a fraud in this court*. That isn't their truck. That isn't the truck. And I'll – I'll give you these photos and let you look at it and you can see for yourself, different truck. *They changed the plates*. And if they wanted to prove it was the truck, show me a vehicle identification number that matches up.

Approximately three transcript pages later, and while addressing Deanna's implied allegation of police corruption contained in Ex. 43, the prosecutor stated:

> *But there is* [sic] *some people in here that have been corrupt and deceitful, and it's his family*. Ladies and gentlemen, we've talked about this truck.

---

[9] The portions of the argument challenged by Defendant are identified with italics.

May I see your exhibits of the truck, please? Deanna has it all wrong. We're not wanting photos of the truck to go show our witness to get a story right. His story is what it is. It's written down and it's documented in a transcript. We're not trying to change that. What we want to know is why, back in May of '09, *they're showing photos of a truck with Michael's license plate that is not Michael's truck. That's called tampering with evidence, ladies and gentlemen. It's a crime. Hindering prosecution is a crime.* Because way, way back then, these photos are being shown to witnesses in this case, and they're going to be shown to you, and Chris Amick sat here and vouched for him that this was his truck. But you know what? Where's the VIN number to prove it? Where's the VIN number to prove it?

….

Now, ladies and gentlemen, if you'll look really closely, this is the wheel of that truck that was taken that night. I don't know what you call it, but there's a black – and I wish they had taken better photos, but they didn't – there's a black fender well here, molding. Okay? That's his truck, taken that night at his house. His license plate. When you get back and look at Q and R, all four wheels pristine fender wells, nothing on there black. You can't pull that off without tearing it. You've got to go fix it all. Okay? These have been altered. And you say, well … it's no big thing, they took off the black to make it look better, they liked it better. Well, that's fine. That's fine. Okay. You don't hide it in Arkansas, like you heard from Deanna. They're hiding it. She's proud of the fact that her and her family hid it. Would do it again to protect one of their own. But you know what? If you look really closely, there's molding up here high on the door that runs the length of it that doesn't match up to the little bit of molding and shape here. And you can take these back in your jury room and look at them.

During Defendant's closing argument, defense counsel stated:

And if the State wants to pretend that we've committed some fraud on the Court, do you know who took this picture? I think Eric King said Kass Brazeal was taking some pictures that night. Where's Kass? You didn't hear from Kass. He's one of the top lead investigators in this case. Where's Kass? Where's he been? Do you know who took this picture? Eric King didn't. These are from the same people who are losing hundreds of photos of this – of this investigation. Do you know where this picture came from? I don't.

In the State's rebuttal argument, the prosecutor stated:

The reality of the case is what's coming from the witness stand, not from [defense counsels'] mouths. *And, quite frankly, I am kind of tired of them*

16

*misleading you and not telling you everything.* "Where's Kass Brazeal? Where's Kass Brazeal?" Well, Eric King told you he and Kass were there, they were looking at the scene. Kass took those photographs, and those are the photographs. Well, we should have produced Kass. Well, under the law we don't have to. Actually, we could still be here with witnesses going through all this minutia if they want us to. But Eric said those are the photographs. But Kass has been out in the hall for three days, under their subpoena. And you know what, Kass was the one here that they were going to start this nonsense with about this truck. This – These are from his depo way – and the photographs were taken way back in May of '09. That's why Kass didn't get to the stand, *because they got caught with their pants down.* Now, I don't know if [defense counsel] were in on this fraud, but I know [Defendant's] family is. *And it's about time the defense attorneys tell you the full truth, which they have yet to do.* Kass Brazeal is not here. Why didn't they bring Kass? We didn't need to. We brought you the witnesses we could bring you, to show you what happened, without all this confusing nonsense and noise.

Finally, the prosecutor stated:

The 12 of you will stand in place of our community, this community, and *decide whether we're going to tolerate fraudulent behavior on the Court like this* and whether we're going to tolerate crimes like this.

No objections were made to any of the italicized comments about which Defendant now complains. Defendant seeks plain error review pursuant to Rule 30.20. He contends the trial court plainly erred by failing to declare a mistrial *sua sponte* because of the prosecutor's statements.

"Statements made in closing argument rarely constitute plain error." ***Lloyd***, 205 S.W.3d at 908. When such statements are made without objection and request for relief, "a trial court's uninvited interference with summation may itself constitute error." ***Id***. "Counsel's failure to object may have been intentional for reasons of trial strategy, or the comment may have been unimportant enough to merit an objection." ***Id***. "Trial judges are not expected to assist counsel in trying cases, and trial judges should act *sua sponte* only in exceptional circumstances." ***State v. Thompson***, 390 S.W.3d 171, 176 (Mo. App.

17

2012). That is simply because the failure to object denies the judge opportunity to make correction. *State v. Kempker*, 824 S.W.2d 909, 911 (Mo. banc 1992). For these reasons, plain error claims based upon closing arguments "are generally denied without explication." *State v. White*, 247 S.W.3d 557, 563 (Mo. App. 2007).

We will only reverse for unobjected-to error in closing argument upon a showing that "there is a sound, substantial manifestation, a strong, clear showing, that injustice or miscarriage of justice will result if relief is not given." *State v. Wood*, 719 S.W.2d 756, 759 (Mo. banc 1986). Defendant bears the burden of proving the improper argument had a decisive effect on the jury's determination. *State v. Wren*, 643 S.W.2d 800, 802 (Mo. banc 1983). A prosecutor's statement has a decisive effect if there is "a reasonable probability that the verdict would have been different had the error not been committed." *State v. Brooks*, 158 S.W.3d 841, 853 (Mo. App. 2005).

Defendant first argues that the prosecutor argued facts outside the record. We disagree. A prosecutor may "argue the evidence, the reasonable inferences from that evidence, and the credibility of the witnesses." *Glass v. State*, 227 S.W.3d 463, 474 (Mo. banc 2007). In doing so, a prosecutor "may even belittle and point to the improbability and untruthfulness of specific evidence." *State v. Kreutzer*, 928 S.W.2d 854, 872 (Mo. banc 1996). The prosecutor may even state a conclusion if fairly drawn from the evidence. *Clemmons v. State*, 785 S.W.2d 524, 530 (Mo. banc 1990). Based upon our review of the record, the prosecutor was asking the jurors to draw reasonable inferences from the evidence. Ex. 43 tended to prove that: (1) Deanna wanted Defendant's truck to be kept away from police and the prosecutor to prevent any further examination of it; and (2) Defendant encouraged and agreed with Deanna's plan. Her statement that she told

18

"her family" of her plan suggested Christopher was involved since he had possession of the truck and had moved the vehicle to a friend's home in Arkansas before trial. Exs. Q and R, which Christopher authenticated, contained different features than the truck shown in Exs. 9-11.

Defendant next argues that the prosecutor made improper personal attacks against defense counsel. Viewed in context, however, the prosecutor's comments were largely directed at Defendant's family and were appropriate for the reasons stated above. The references to defense counsel, viewed in context, were directed at their tactics or techniques, which is permissible. *See State v. Reyes*, 108 S.W.3d 161, 170 (Mo. App. 2003); *State v. O'Haver*, 33 S.W.3d 555, 561 (Mo. App. 2000). Even if the State does make objectionable comments, however, there is no *per se* rule mandating reversal. *State v. Howard*, 896 S.W.2d 471, 485-86 (Mo. App. 1995). Defendant compares the prosecutor's statements to cases in which the State: (1) argued that defense counsel "lied or intentionally attempted to mislead the jury," *State v. Greene*, 820 S.W.2d 345, 347 (Mo. App. 1991); and (2) implied that defense counsel "took measures" to keep a witness off the witness stand, *State v. Hornbeck*, 702 S.W.2d 90, 92-93 (Mo. App. 1985).[10]

We disagree that the prosecutor's statements in the instant case are in any way comparable to the misconduct described in *Greene* and *Hornbeck*. Viewed in context, the prosecutor was criticizing a portion of defense counsels' closing argument – not defense counsel personally. During closing argument, defense counsel asked the jury to draw an adverse inference from the prosecutor's failure to call State Fire Marshal Brazeal. Defense counsel suggested that decision called into question the authenticity of

---

[10] We note that neither of the aforementioned cases involved plain error review.

19

the State's photographs of Defendant's truck. The prosecutor's statements were merely a request that jurors should not draw any such inference because Brazeal did not testify. *See* **State v. Ward**, 807 S.W.2d 225, 226 (Mo. App. 1991) (finding that the prosecutor – who referred to defense counsel's focus on minor inconsistencies in the evidence as "trickery" – did not imply that defense counsel was personally dishonest). Because defense counsel raised the issue of the prosecutor's failure to call Brazeal in closing argument, the prosecutor's comments also were retaliatory. "Considerably more leeway is granted when argument is retaliatory." **State v. Mease**, 842 S.W.2d 98, 109 (Mo. banc 1992).

Because Defendant has failed to demonstrate that the trial court committed evident, obvious and clear error affecting the defendant's substantial rights, our inquiry ends. **Mack**, 301 S.W.3d at 95. Point III is denied.

*Point I – Juror Substitution*

In Point I, Defendant contends the trial court erred by overruling defense counsel's objection and request for a mistrial relating to the replacement of a juror after deliberations had begun. This point arises out of the following events.

Prior to the commencement of jury deliberations, the trial court informed Juror 14, who was an alternate, that she was excused. She left the courthouse. The jury was sent to the jury room around noon.

At about 4:15 p.m., the bailiff reported that Juror 12, a diabetic, was feeling weak and dizzy. After eliciting suggestions from counsel, the trial court brought the entire jury back into the courtroom. Juror 12 stated that he felt like he was "going to pass out" and

did not know whether he could continue to deliberate. After some discussion, however, Juror 12 agreed to try. The jury was sent back around 4:45 p.m.

The trial court and counsel continued to discuss the situation. Defense counsel expressed concern that Juror 12 would not be able to meaningfully participate in deliberations. At 4:50 p.m., the trial court then contacted Juror 14 by telephone and ascertained that she had not discussed the case with anyone after being released. The court instructed Juror 14 not to discuss the case with anyone and to return to the courthouse.

Juror 14 arrived at the courthouse at 5:35 p.m. She was questioned again by the court in the presence of counsel and stated as follows:

> THE COURT: Ma'am, do you remember earlier today when we had selected a jury you were an alternate and this Court released you?
>
> JUROR NO. 14: Right.
>
> ….
>
> THE COURT: And I asked you if you had talked to anyone about the case since you had been excused. And would you go ahead and repeat that again? Someone – I believe you said that someone was asking you and you said you had been excused?
>
> JUROR NO. 14: I told my boss I'd been excused, what a relief.
>
> THE COURT: Yes, ma'am.
>
> JUROR NO. 14: And my son called to see if I – because he saw my car at home.
>
> THE COURT: Yes, ma'am. Now, have you discussed with anyone about any of the facts in this case?
>
> JUROR NO. 14: No.

THE COURT: You have not?

JUROR NO. 14: No, I have not, because the jurors were still deliberating.

After she was sent out of the courtroom, defense counsel requested a mistrial because: (1) Juror 14 could not get "caught up on what's been discussed" after five hours of deliberation; and (2) it was possible she had discussed the case with someone after being released, even though she had denied any such discussions. Alternatively, defense counsel asked that the jury be sent home over the weekend to see whether Juror 12 would recover and be able to continue deliberating. The court made the following ruling:

> [Court]: … The Court is going to overrule your motion for a mistrial, and the Court is going to ask that [Juror 14] be brought in and sworn by the clerk. Then I'm going to ask the bailiff to go back to the jury room and bring [Juror 12] in before the Court and I'm going to substitute, to use that word, and I'm going to send [Juror 14] in, in his place. Now, gentlemen, I don't feel the Court should give additional instructions. The jury has their written instructions, and I think the Court would be getting way out giving oral instructions. I think you will agree with that, [defense counsel]? Do you agree with that?
>
> [Defense counsel]: I do agree with that, Judge.

At 5:55 p.m., all 12 original jurors were brought back into the courtroom. Juror 12 stated that he was not feeling any better and that "[e]verything is just blurred that you're talking about. You know, I can't focus on any of it, really." After Juror 12 was excused, the court told the remaining jurors:

> [T]hese things happen. I'm trying to do the best I can to make sure that both the State and the Defendant have a fair and impartial trial. And I've had to take whatever action this Court feels that I can with the help of the attorneys from both sides, and that's why I excused [Juror 12]. I'm not a medical person, but based on what he said, I felt I should excuse him from continuing. I don't want anyone's health in jeopardy. And so you all are familiar, I called [Juror 14] and asked her to come back. At this point, I'm going to ask the clerk to swear all 12 of you again and send you back to continue your deliberation.

22

The jurors retired to the jury room shortly before 6:00 p.m. At some time not disclosed by the record, the jurors concluded their deliberations and returned to the courtroom. Defendant was found guilty on both charges. The jurors were polled, and each agreed with the verdict on Count I and Count II. The following then occurred:

> THE COURT: And this is a little unusual, very unusual, but I've brought you back in and we went through this procedure. Did you have sufficient time to go over all of the instructions, the evidence, and discuss it fully with all the other 11 jurors?
>
> JUROR NO. 14: Are you talking to me, sir?
>
> THE COURT: Yes, ma'am, you.
>
> JUROR NO. 14: I pretty much remembered everything that was going on and I really knew how I felt when I came back.

The court accepted the verdicts and excused the jury.[11]

Defendant's motion for new trial included an allegation that the trial court erred by denying Defendant's motion for mistrial and placing Juror No. 14 on the jury. Defendant sought a new trial because: (1) Juror No. 14 had been released and absent for approximately five and one-half hours; (2) the jury returned a verdict in only eight minutes; and (3) Juror No. 14 said she already knew how she was going to vote, which

---

[11] Neither the legal file nor the transcript show when the jurors returned to the courtroom. After the court read the verdicts and polled the jurors, they were excused. Some additional discussion occurred in the courtroom among the judge and counsel. Thereafter, they went into the judge's chambers, where the jury's verdicts were stamped at 7:05 p.m. and filed. During those in-chambers arguments on Defendant's motion for judgment of acquittal, defense counsel asserted that the jury only deliberated for ten minutes. The prosecutor did not agree with that assertion and stated that "the Court record will tell us how long they deliberated."

23

rendered the deliberations a sham.[12] After conducting a hearing, the trial court denied the motion.

In Point I, Defendant contends the trial court erred by denying Defendant's objections and requests for a mistrial. Defendant argues that these rulings: (1) violated his constitutional rights to due process pursuant to the Sixth and Fourteenth Amendments to the United States Constitution and art. I, § 10 and § 18 of the Missouri Constitution; and (2) were contrary to § 494.485.

Defendant did not assert these alleged constitutional or statutory violations below. Therefore, we review only for plain error. *State v. Hannah*, 337 S.W.3d 114, 116 (Mo. App. 2011); *State v. Placke*, 290 S.W.3d 145, 152-53 (Mo. App. 2009). The outcome of plain error review "depends heavily on the specific facts and circumstances of each case." *Roper*, 136 S.W.3d at 900. Plain error exists only when the trial court's error so substantially violates a defendant's rights that a manifest injustice or miscarriage of justice results if the error is not corrected. *See* Rule 30.20. Plain error can serve as a basis for granting a new trial on direct appeal only if the error was outcome determinative. *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006). The defendant bears the burden of establishing the existence of a manifest injustice or miscarriage of justice. *See State v. Bennett*, 218 S.W.3d 604, 611 (Mo. App. 2007).

Defendant's argument is based upon the provisions of § 494.485, which states in relevant part:

---

[12] This eight minute figure is inconsistent with defense counsel's in-chambers assertion immediately after the trial and with the assertion in Defendant's appellate brief that the jury was out for ten minutes.

24

> Alternate jurors, in the order in which they are called, shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. … Alternate jurors who do not replace principal jurors shall be discharged after the jury retires to consider its verdict.

According to Defendant, § 494.485 "clearly require[s] that once deliberations have begun, no substitutions in the jury be made. … It brooks no alternative procedure. The failure to comply with its mandate is reversible error." To support this assertion, Defendant relies upon cases from other jurisdictions that fall into two categories:

1. Cases holding that noncompliance with a statute similar to § 494.485 is a structural defect that warrants automatic reversal, without requiring the defendant to prove any actual prejudice. *See State v. Murray*, 757 A.2d 578, 591-92 (Conn. 2000); *Woods v. Commonwealth*, 152 S.W.2d 997, 998-99 (Ky. App. 1941); *State v. Bobo*, 814 S.W.2d 353, 358 (Tenn. 1991).

2. Cases holding that noncompliance with a statute similar to § 494.485 creates a presumption of prejudice which the prosecution must overcome to avoid a new trial. *See People v. Burnette*, 775 P.2d 583, 587-88 (Colo. banc 1989); *State v. Sanchez*, 6 P.3d 486, 495 (N.M. 2000).

Defendant's argument is flawed because it assumes that reversible error and plain error are the same thing. As we explained in *State v. Massa*, 410 S.W.3d 645 (Mo. App. 2013), that is simply not true:

> Rule 30.20 is no panacea for unpreserved error, and does not justify review of all such complaints, but is used sparingly and limited to error that is evident, obvious, and clear. Not all prejudicial error – that is, reversible error – can be deemed plain error. A defendant's Rule 30.20 burden is "much greater" – not merely to show prejudice, but manifest injustice or a miscarriage of justice – which in this context means outcome-determinative error.

*Id*. at 656-57. The out-of-state cases cited by Defendant are all factually distinguishable because each one involved a preserved claim of error. Defendant has not cited a case, and we are not aware of one, holding that noncompliance with a statute like § 494.485

25

constitutes a plain error warranting relief, in the absence of a timely objection at trial. Furthermore, the automatic reversal or presumption of prejudice rules adopted by other states for preserved errors are incompatible with Missouri's well settled rule that a defendant is not entitled to plain error relief absent proof of prejudice so severe that it will cause a manifest injustice or miscarriage of justice unless corrected. *See State v. Roggenbuck*, 387 S.W.3d 376, 381 (Mo. banc 2012). Defendant has failed to meet that high burden here.

Defendant's complaint that Juror No. 14 "discussed the case with others" is not supported by the record. The trial court questioned Juror No. 14 and ascertained that she had not discussed the facts of the case with anyone after leaving the courthouse.

Defendant complains about Juror No. 14's statements expressing relief at being excused and surprise at being recalled to the courthouse. Neither statement was directed at Defendant or demonstrates that he was prejudiced by Juror No. 14's substitution onto the jury.

Defendant complains about the jury not being instructed to begin deliberations anew. This argument lacks merit because defense counsel expressly agreed with the trial court's decision not to give any oral instructions to the jury. Affirmatively acquiescing to an action by the trial court waives even plain error review. *See State v. Johnson*, 284 S.W.3d 561, 582 (Mo. banc 2009).[13]

---

[13] In Defendant's brief, he also concedes that a trial court subjects itself to the possibility of reversible error by giving oral instructions to the jury. *See State v. Cross*, 594 S.W.2d 609, 610 (Mo. banc 1980).

Defendant complains that the jury only deliberated ten minutes before returning its verdict. This argument lacks factual support because our review of the record does not disclose how long the jury was out after Juror No. 14 was substituted. In any event, "[t]he amount of time to be spent in deliberation is a matter for the jury to determine." *State v. Peck*, 429 S.W.2d 247, 252 (Mo. 1968) (affirming a jury verdict convicting the defendant of escape from a state institution where the record did not establish the length of deliberations, but the defendant alleged that the jury deliberated for eight minutes); *see also State v. Payne*, 342 S.W.2d 950, 955 (Mo. 1961) (affirming a jury verdict convicting the defendant of manslaughter where the record reflected that a verdict was returned after twenty minutes of deliberations). After the verdict was returned, the trial court questioned Juror No. 14 and ascertained that she had sufficient time to review the instructions and discuss the case with the other jurors.

For all of the foregoing reasons, Defendant has failed to meet his burden of proving that he is entitled to plain error relief. Point I is denied, and the judgment of the trial court is affirmed.

JEFFREY W. BATES, P.J. – OPINION AUTHOR

GARY W. LYNCH, J. – CONCUR

DON E. BURRELL, J. – CONCUR